Nelson v. Butterfield.

JONATHAN NELSON *versus* JACOB BUTTERFIELD & *al.*

When land has been flowed by means of a dam erected for the use of a watermill; while the owner of the land suffers no damage, and can therefore maintain no suit or process, 'or in any way prevent such flowing, he cannot be presumed to have granted, or in any manner to have surrendered or relinquished any of his legal rights; and no prescriptive right to flow his lands without payment of damages can be acquired against him.

But where damages have been occasioned by the flowing, and the owner of the land flowed has had the power to maintain a process to recover them, a prescriptive right to flow the land without payment of damages may be acquired.

If a dam be erected which retains the water of a pond and causes it to overflow the lands of others, but no mill is carried by the fall of water thus created; and such dam is only necessary to raise and preserve the water for the use of mills, lower down on the stream and carried by other waterfalls, at certain times when the water usually flowing in the stream has become diminished; the only remedy is by proceedings pursuant to the statutes for the support and regulation of mills.

One who is neither the owner or occupant of a watermill for the use of which the water has been raised or continued, nor the owner or occupant of the milldam, is not liable to the owner of the land flowed, although he may be benefitted by the flow of the water.

If a blacksmith's shop in which the bellows is worked by a waterfall, can be considered a mill, yet if there is only a right to use the water for that purpose at the will of the owners or occupants of the dam, and at such times and under such restrictions as they may please to prescribe, the owner of such shop is not liable to the payment of damages for the flowing of the water. It would not be a mill for whose use the water was either raised or continued.

In a complaint under the statute to recover damages to land, occasioned by its being flowed by a dam erected for the use of mills, the question whether the complainant has *suffered any damages,* is to be determined only when the *amount* of damages is under consideration.

Nelson *v.* Butterfield.

A lot of land was conveyed, and described as bounding on one end upon a pond; and it appeared that there was a narrow cove or arm of the pond extending from the pond across the lot; and that if the land conveyed was limited by this cove, that the lines would not correspond with those of the adjoining lots, and there would remain a portion of land not conveyed, between the cove and the pond. *It was held*, that the land granted extended across the cove to the main body of water called the pond.

This was a complaint under the statute for flowing the complainant's land in China, being the south part of lot No. 15 on Jones' plan, from the first day of May, 1830, to Aug. the 8th, 1833, brought against Jacob Butterfield and Thomas Greenlow.

The complainant proved that there was a stone dam at the outlet of twelve mile pond, which raised the water of said pond. It was proved that said dam was erected on the land of Francis M. Rollins by Joseph Southwick and the mill owners in 1817, as a reservoir dam to save the water for the use of several dams and mills on different parts of the stream, running from that pond to the Sebasticook river. It was proved, that Greenlow, in 1828, was employed by those who erected the dam, to put in a new sluiceway, the old one having become rotten, and that by their consent he put in a water wheel, to be propelled by the water as the mill owners wanted it to run, which wheel was used to work his bellows in his blacksmith's shop, and for no other purpose, the said Greenlow being a blacksmith, and working at his trade in his shop near the dam, and not owning any interest in any mill on said stream or pond, and being tenant at will in the use of said wheel.

Butterfield, it was proved, was a part owner in a dam and mills which were about seventy-five rods from said stone dam, down the said stream, and Butterfield's dam did not raise the water in the pond, there being a head and fall of water at his privilege of about fourteen feet; and the said stone dam was not necessary to the enjoyment of his privilege, except to raise and preserve a reservoir; that Butterfield on one occasion assisted James Wiggin in sluicing logs through the stone dam; that prior to said first day of May, said Butterfield was heard to say that one Bragg, who wished to have the water stopped

to repair his mill, could not have it done, unless he should be at his proportion of the expense of resisting the lawsuit commenced by the town of China; that neither Butterfield nor Greenlow had any interest in the land on which said stone dam was built, nor did they aid in building the same, nor had they since acquired any interest in it, unless it appears from the facts herein stated.

The foregoing is all the evidence which was produced against the respondents in relation to their connection with the stone dam.

The respondents requested the Court, then holden by WESTON C. J. to instruct the jury, that they were not liable to this process upon the foregoing testimony, and that a complaint for flowage under the statute would not lie for a reservoir dam, used only to save the water, and not to create a head and fall of water to carry the mills; and that said Greenlow's blacksmith's shop was not a mill; but the Court, for the purposes of this trial, instructed the jury, that they would determine from the evidence, whether the respondents had not an interest in said stone dam; that said facts had a tendency to prove such an interest in said stone dam; and if so, they were liable to this process; that said stone dam, although it were used only to save the water and not to create a head and fall for the mills, was such a dam as was embraced within the statute, for the erection and maintenance of which, a person would be liable to this process; and that for this trial and with a view to settle other facts, said blacksmith's shop might be considered a mill under the statute giving this process; that the putting in the wheel was evidence that Greenlow was interested in said stone dam; and that the benefit which Butterfield derived in having the water saved, with the other facts, was evidence that he had an interest in said stone dam.

The lot on which said stone dam was built, was number 18, according to Jones' plan, and was granted Jan'y 8, 1794, by the Proprietors of the Kennebec Purchase to Nehemiah Getchell. The lot on which Butterfield's dam and mills were built,

being No. 34, was granted to John Getchell, with the mill privilege thereon, Dec. 28, 1796. John Getchell, in 1779 or 1780, had erected a dam and mills on said lot, No. 34, about 20 rods below the stone dam, and about 50 rods above Butterfield's dam and mills, which dam, called the Getchell dam, remained until about the year 1800 entire, when the sluiceway was taken out, and the water was allowed to pass through. The saw-mill of John Getchell having been burned down, he built the dam and mills now owned by Butterfield, in 1796. The dam called the Livermore dam was built by the said John Getchell in 1800 on the same site, where the stone dam now stands, and the pond continued to be flowed by the Getchell dam until the Livermore dam was finished; the Livermore dam flowing the pond, as did the Getchell dam, but not to the same extent; and the said John erected the new dam below as aforesaid, to obtain the head and fall of fourteen feet, keeping up the pond as aforesaid by the Livermore dam. It was proved that said John Getchell, in erecting the dam called the Butterfield dam, and in building the Livermore dam, did not abandon the right of flowing the pond, which he had possessed by means of the Getchell dam, as aforesaid. It was further proved, that the Getchell dam, being the oldest dam, was nine or ten feet high, and flowed the pond higher than the Livermore or stone dam, and that the Livermore dam was between two and three feet higher and flowed the pond more than the stone dam.

The complainant proved that said proprietors having employed John Jones to survey said township, upon the petition of said John, he being an alien, the grant of said lot 15, was made to Timothy Jones in 1790. But Nelson did not connect himself with the grant to Jones, nor claim under it. Said Nelson introduced in evidence two deeds from David Spratt to him, one dated March 8, 1828, the other April 10, 1828, conveying the premises described in the complaint. Nelson proved by Samuel Ward, that one Parker Burgess cut a few acres of trees on that part of No. 15 which Nelson owns, about 1780; that after him one Jabez Lewis cut some trees;

that Abijah Ward succeeded Lewis, and built the first house on the lot in 1790; that Abijah continued on said lot till he was succeeded by said David Spratt in 1799; and said Spratt remained on the same until he conveyed to said Nelson as aforesaid. Nelson did not introduce any other deed as evidence of his title, than the deed of said Spratt, nor any deeds as evidence of the title of prior occupiers of said land. There was no evidence that any portion of said lot 15 had been fenced until it was owned by Nelson. Said Spratt, a witness for said Nelson, testified that while he was on said land, he cut down some ash trees on the land alleged to be flowed, and made staves of them. It was admitted, that Butterfield claimed title to his mills and dam under John Getchell through mesne conveyances. There was evidence tending to show, that the pond had been raised higher within ten or twelve years than before that time, and there was evidence tending to show, that such was not the case, but that it was higher when said Getchell dam was built, than at any time since.

The Court instructed the jury that the respondents could not justify the flowing of said Nelson's land described as aforesaid, by virtue of owning said lot No. 34, and the erecting said dams, nor by any facts in the case, because the proprietors parted with lot No. 15 before they did with lot 34; that the said Nelson had a right to such part of lot 15 as was described in his deed, as it was in 1774, when said Jones' plan was made; that if the land of Nelson, before described and alleged to be flowed, was covered with water by means of said dams, from the time of erecting the first dam to the date of said Nelson's deeds, still he was entitled to maintain this process and their verdict would be for him. It appeared in evidence that there was an elevation, or ridge of land on the eastern side of lot 15, where it strikes the pond, running up beyond the northern line of 15, and at its termination on lot 14 there was a cove into which the water flowed from the pond and then across lot 15, which was the flowing of which complaint was made.

The plans were referred to, but did not come into the hands of the Reporter. The respondents contended, that as they began to flow said land before any one acquired a title to it, and before any one commenced occupying any part of said lot 15, they had as good a right to flow it, as others, not claiming under said proprietors, had to occupy it. But the Judge instructed the jury otherwise, and further instructed them, that said Nelson being in the seisin of said land, had a right to hold it as delineated on said Jones' plan, and could maintain this process. And the Judge further instructed the jury, that if any part of said Nelson's land was flowed by said dam, the law presumed it was a damage to him, and that the proof introduced by the respondents to show there was no damage could not have the effect to remove said presumption; that no length of time would give a person the right to flow without damages; nor be evidence of a grant or a license; and that the said Nelson was not under any obligation to request the respondents to reduce or abate said dam before commencing this process. The jury returned their verdict for the complainant. If the ruling or instructions were erroneous the verdict was to be set aside, otherwise judgment was to be rendered thereon.

*Wells* and *Bradbury* argued for the respondents, and contended, that the verdict should be set aside for the following among other grounds.

The complainant shows no title to the land flowed. He was bounded on the pond. His lot, No. 15, extended only to the pond, as it was when he took his deed, and did not include the land flowed. The part of the pond called a cove is as much a part of the pond, as any other. *Bradley* v. *Rice*, 13 Maine R. 198. As the complainant does not connect himself with the original title, but takes his deed from a mere trespasser, and so late as 1828, he takes the possessory right only to the land, as it then was. *Waterman* v. *Johnson*, 13 Pick. 261.

This process cannot be maintained against either of the re-

spondents in consequence of the erection of the reservoir dam. Such dam is not one contemplated by the statute respecting mills and flowing of lands. The dam there contemplated is one to raise a head of water necessary to the working of the mill; and one erected at a distance to feed the ponds forming the power to carry the mills does not come within the statute. The process cannot be maintained by the erection of a dam without mills. *Baird* v. *Hunter*, 12 Pick. 556. Butterfield was in no manner connected with the dam. Neither he, nor his grantor, had any thing to do with the erection, use, or continuance of that dam, and owned no part of the land on which it stood. The mere fact that others above him on the same stream improved the privilege, whereby he as well as all others below derived a benefit, does not subject him or them to the payment of damages by reason of a dam so erected. Greenlow is not liable to the process, because his blacksmith shop is not a water mill; and because he had not even the right to use the water at his shop, saving by the verbal permission to take it as it run, to blow his bellows, until he had notice to desist.

The jury should have been permitted to inquire and find, whether the complainant had been injured by the flowing. If he has sustained no damage, the process cannot be maintained. *Lowell* v. *Spring*, 6 Mass. R. 398. In *Hathorne* v. *Stinson*, the opinion of the Court goes on the ground, that this question was to be submitted to the jury.

The complaint cannot be sustained, because the land had been overflowed to the same extent for more than forty years by the owners of the mills without payment of damages. Unless a prescriptive right can be acquired by the actual use of the water in the same manner, and occasioning the same damage, for some period of time, the law must be different as to this description of property from what it is in all others, and the evils attending it will last for ages. The doctrine laid down at the trial was questioned, in its full extent, in the cases of *Hathorne* v. *Stinson*, and the decisions in Massachusetts are directly opposed to it. *Williams* v. *Nelson*, 23 Pick. 141; *Borden* v. *Vincent*, 24 Pick. 301. The decision in *Siden-*

*sparger* v. *Spear*, was based on a ruling in the Court below, general, it must be conceded, and may be right or wrong, because the exceptions do not show, whether damage had been sustained for twenty years or not.

By the grant from the proprietors to Getchell, he had the clear right to flow this land. The Judge ruled, that the respondent, Butterfield, could not avail himself of this right, because the proprietors had made a prior grant of the Nelson lot. Had the complainant connected himself with that title, the ruling might have been right. But he did not, nor did he show any claim or possession extending back to the origin of ours. Ours therefore was good against each and every one, who could not claim under a prior grant from the owners.

*N. Weston*, for the complainant, contended that the reservoir dam was placed there under such circumstances as compelled the persons injured by the flowing to resort to the statute for their remedy. They could not treat the persons erecting it as trespassers. Not a single wheel, but Greenlow's, is turned by the waterfall at that dam; and yet there is not a mill between the pond and the river to which the water retained by the dam is not absolutely necessary at some seasons of the year. The dam was erected for the use of all the mills, all are benefitted by it, and the water is necessarily owned by all, and all are liable for the damages.

It has however been contended, that Butterfield is a mere stranger to the building of the dam, and does not claim under their title. The case however shows, that he succeeded to the interest of Getchell, one of the original builders of the dam, and has always been benefitted by it.

But this objection does not apply to Greenlow, whose wheel is carried directly by this fall. It is said however that his blacksmith's shop is not a mill. The mere rotation of the wheel would not blow the bellows, and there must have been machinery connected with it. It is immaterial by what name it is called. It is as much a mill as nail works, rolling and slitting mills, clapboard machines, or factories.

The complainant has shown title to the land flowed. His grant was described as lot fifteen, and must have been intended as fifteen on Jones' plan, as no other has been mentioned. That extends to the pond not to the cove, and to the pond as it was when the plan was made, and not as the pond is since the flowing. But independent of that consideration, bounding upon a pond, carries the grantee to the body of water commonly called the pond, and is not limited to where it may strike some small cove connected with the pond. If it was intended to stop at the cove, it would have been so expressed in the deed.

It is not necessary, that the complainant should carry back the chain of title through every link to Jones. The proprietors set up no claim to this lot; Jones sets up no title adverse to ours; the complainant and his grantor have been in possession more than twenty years; and he is entitled to be considered as owner of lot fifteen, as conveyed by the proprietors to Jones, with all the rights and privileges Jones had. The land was not flowed when the grant to Jones was made, and their grant afterwards to Getchell gave him no right to flow Jones' lot.

It is contended for the respondents, that they have acquired a prescriptive right to flow this land without payment of damages, by having done so unmolested for more than twenty years. This question is not a new one in this State. It has been decided, that the right cannot be so acquired. *Tinkham* v. *Arnold*, 3 Greenl. 120; *Hathorne*, v. *Stinson*, 1 Fairf. 224 and 3 Fairf. 183; *Sidensparger* v. *Spear*, 17 Maine R. 123. The case cited from Massachusetts may be good law there, where it is scarcely possible to flow land without doing an injury, and without the owner's knowing it; but ought not, and cannot for any reasons there given, authorize a reversal of our own decisions.

The instruction that it must be presumed that there was some damage, was based on the fact, that the land was improved, and was authorized by *Sidensparger* v. *Spear*, before cited.

The case was argued at the May term, 1842, and continued *nisi*. The opinion of the Court, TENNEY J. having been consulted as counsel and taking no part in the decision, was afterwards drawn up, and announced at an adjourned term in Cumberland, in Feb. 1843, by

SHEPLEY J. — Several important questions are presented for consideration. One is, whether the complainant has established his title to the land overflowed. He claims title of part of lot numbered fifteen, bounded upon the twelve mile pond in the town of China. There is a body of water denominated a cove running out on lot numbered fourteen from the pond, and continuing across lot numbered fifteen and separating the larger portion of it from a ridge of land remaining uncovered, with water between the cove and the pond. The objection to the title is, that the cove is but a part of the pond, and that according to the decision in the case of *Bradley* v. *Rice*, 1 Shep. 198, the complainant's title is limited to its margin. It appears, that the proprietors of the township caused their lands to be surveyed into lots, which were designated by numbers and ranges. And it is necessary, that the lines of lot numbered fifteen should be extended across the cove to the main body of water in the pond, to make it conform to the other lots. And if they were not so extended, there would remain a ridge of land between the cove and pond not included in any lot and unappropriated. If it should be considered, that a conveyance bounded on a natural pond is to be limited to the first portion of water connected with it, the effect would be to exclude from the conveyance land separated from the residue of the lot by such a body of water, although so small, that the surveyor, while running the lines of the lot, might step over and disregard it. A small body of water thus connected would not be referred to or designated in common conversation as the pond; but would have some other name, as a cove, creek, or arm of the pond. And this would continue to be the designation of any larger and like body of water, which by common consent would seem to require a designation by some term other than the pond. It is therefore

best to conclude, that the parties to the conveyance used language in its ordinary and usual acceptation to decide, that the intention was not to limit the lot to a body of water usually designated by a different name; but to that body of water designated usually by the term used 'in the deed. And as the intention of the parties is to be regarded, the complainant must be considered as acquiring a title to the lot including the cove and extending to the margin of the pond.

Another question is, whether the jury should have been permitted to find, that the complainant had not been injured. By the statutes as existing before this State was separated from Massachusetts, this was a proper subject for the consideration of the jury. But there can be no doubt, that it was the intention of the legislature of this State to require that defence to be first made before the commissioners, whose report may be impeached, and this question among others may then be regularly presented to a jury for decision. The difference between the statutes before the revision of 1821, and since, was noticed in the case of *Cowell* v. *The Great Falls Man. Co.* 6 Greenl. 282. By the additional act of Massachusetts, passed on the 28th of Feb. 1798, the complainant was required to state, " that he sustains damage in his lands by their being flowed in the manner mentioned in said act." And the owner or occupant of the water mill might, among other matters of defence, " dispute the statement made by the complainant." And the act of that State, passed on the 27th of Feb. 1796, did not authorize the jury which assessed the damages to decide, that the complainant had not suffered any damages. On a revision of these statutes in this State, in the year 1821, the words " dispute the statement made by the complainant," were omitted in the statement of the defences, which might be made before a jury on the first trial in Court. And there was a provision inserted " that if said jury (alluding to the jury authorized to view the land and assess the damages) shall find and so return in their verdict, that no damage is done to the complainant by flowing his land as aforesaid, the respondent shall recover his costs." The additional act passed

on the 14th day of February, 1824, c. 261, also provided, that the commissioners appointed to view the land and assess the damages, should determine, whether the complainant had suffered damage, subject to a revision before a jury. The statutes in Massachusetts did authorize the jury in the first instance to determine, whether the complainant had suffered damage; but the statutes in this State have taken from such a jury that power, and transferred it to the jury or commissioners authorized to assess the damages. The presiding Judge was therefore correct in excluding the testimony tending to prove that the complainant had not suffered damage from the consideration of this jury. The question, whether the complainant has suffered any damages, is to be determined only, when the amount of damage is also under consideration.

Another question is, whether the dam, which retains the water of the twelve mile pond and causes it to overflow the land of the complainant is protected by the provisions of the statutes. It is only necessary to raise and preserve the water for the use of the mills on the stream, when the water, which usually flows in it, has become diminished. And it may be inferred from the report that it is necessary to enable the owners to work their mills at all times during the year. The first section of the statute does not prescribe the manner, in which a suitable head of water is to be raised. It only requires, that it should be found necessary to raise it. The means, by which the object is to be accomplished, appear to have been left to the mill owner. There is nothing in the statute to prohibit him from doing it by one or more dams situated at a greater or lesser distance from the mill; or by a dam on or near to which no mill is erected. The water may be raised and retained and conducted in a channel to any distance from the dam for use at the mill. And the owner is by the statutes authorized " to continue the same head of water to his best advantage." The design appears to have been, to authorize the mill owner to raise a suitable head of water and to control and use it in such a manner, as to enable him to employ his mill to the best advantage during the whole year. And that he should be

restricted only by the jury or commissioners, who are author-ized to find, during " what portion of the year the said lands ought not to be flowed." It is the owner or occupant of the mill for the use of which the head of water is raised, who is especially made responsible in damages. And it is only in those sections of the statute, which authorize tenders or offers of compensation, that the owner or occupant of the mill dam is named. The only proper question therefore for considera-tion is, whether it be necessary, that the waters of the pond should be raised and caused to flow over their natural bounds for the purpose of raising a suitable head of water for the use of the mills. And the facts reported lead to the conclu-sion, that it would be necessary to enable the owners to work their mills to advantage during certain portions of the year. The statute appears to have received a like construction in the case of the *Wolcott Woollen Manufacturing Company* v. *Upton*, 5 Pick. 292.

Another question is, whether the fact, that the lands of the complainant have been overflowed for more than forty years to the same extent, can, under the circumstances presented in this report, be considered as an effectual bar to the process. It does not appear from the report of the case of *Tinkham* v. *Arnold*, 3 Greenl. 120, whether the owner of the lands would have suffered any damage during the earlier portion of the time while they were overflowed. The reasoning is general and not limited to any such state of facts. In the case of *Hathorne* v. *Stinson*, 3 Fairf. 183, it appeared, that the lands overflowed " were first brought into cultivation about the year 1790, prior to which time they remained in a state of nature overgrown with bushes and affording no profit." And the question presented for decision was, whether by flowing the lands in that condition from 1760 to 1789, without payment of damages, a legal presumption might arise, that the owners of the milldam had a license irrevocable to flow them to that extent. The Court say, " if the owner of the land sus-tained no damage by the flowing, then his acquiescence ought not to be construed into an admission of right, or taken as evi-

dence against him either of grant or license." The opinion then proceeds to prove that under such circumstances, "his hands are tied. He can neither resort to his action at common law nor to process under the statute. The mill owner can flow in perfect security without license and free from all liability to legal process; and so long as he can do this, no grant or license is to be presumed in his favor."

In the case of *Sidensparger* v. *Spear*, 5 Shepl. 123, the question, whether under such circumstances a license to flow without payment of damages might be presumed, was again presented in connexion with another question, whether when a conveyance of real estate is made, a reservation to flow without payment of damages might be proved by parol testimony and be effectual. In that case the opinion states, that no damage was sustained by the flowing until the year 1835; and the ruling of the Judge against the validity of that defence was approved.

In the present case the report states, that "there was no evidence, that any portion of said lot fifteen had been fenced until it was owned by said Nelson." He purchased it in 1828, and there is no testimony tending to prove, that any profit could be derived from the land, or that it could be injured by the flow of the water before that time. It falls therefore within that class of cases, upon which this Court has, after mature consideration, decided that while the owner of the land suffers no damage and can therefore maintain no suit or process, or in any way prevent such flowing, he cannot be presumed to have granted or in any manner to have surrendered or relinquished any of his legal rights. It is indeed true, that a Court eminent for learning and ability has expressed an opinion, that the case of *Tinkham* v. *Arnold* was not correctly decided. And some remarks were made, in delivering the opinion in the case of *Williams* v. *Nelson*, suited to introduce doubts, whether the later decisions in this State could be sustained. And the question to be now considered is, whether the principles of law, or the decided cases require, that an acquired or purchased right to flow should be presumed from

the facts presented in this case. And to prevent misapprehension, the facts material to the decision of it are considered to be, that the flowing has been continued for more than forty years without payment of damages and without occasioning any damage earlier than the last five years. All presumptions rest upon the experience, and are founded upon a knowledge of man and of his motives of conduct. If a person for a long course of years claims the right to possess or enjoy estates or easements, and exercises that right without being molested, it is to be presumed, that he has done so lawfully. And if another person permits it, when it would be injurious to him, without interruption, it is to be presumed, that he knows, that the person has a legal right to do so. It would be against man's experience and contrary to his motives of conduct to account for it so satisfactorily in any other manner. *Omnia rite esse acta* is a maxim of the law; and it also attributes such conduct rather to the exercise of a legal right, than to an encroachment. If this be the true foundation of presumptions, it will follow, that if the continuance of the possession or enjoyment can be accounted for without presuming any thing to favor it, and without imputing a conscious want of right or negligence to him, who does not interrupt it, the presumption cannot arise. It has no foundation to rest upon; or in the language of the law, it is rebutted. These positions are not inconsistent with the best administration of justice. They will work no wrong; and will secure to all their rights, unless they have been guilty of negligence in asserting them. And this is believed to be the doctrine relating to presumptions in the decided cases.

In the case of *Knight* v. *Halsy,* 2 B. & P. 206, the ground, on which a deed is to be presumed, is stated to be, that " it cannot be supposed, that any man would suffer his neighbor to obstruct the light of his windows and render his house uncomfortable; or to use a way with carts and carriages over his meadows for twenty years respectively, unless some agreement had been made between the parties to that effect."

In the case of *Fenwick* v. *Reed*, 5 B. & A. 232, Abbott C. J. states, that conveyances may be presumed, "in cases where the original possession cannot be accounted for, and would be unlawful, unless there had been a grant."

And Mr. Justice Holroyd in the same case says, "in cases of rights of way, &c. the original enjoyment cannot be accounted for, unless a grant has been made; and therefore it is, that from long enjoyment such grants are presumed." In the case of *Gray* v. *Bond*, 2 B. & B. 667, Dallas C. J. says, "mere lapse of time will not of itself raise against the owner the presumption of a grant. When lapse of time is said to afford such a presumption, the inference is also drawn from accompanying facts." "And the presumption in favor of a grant will be more or less probable, as it may be more or less probable that those facts could not have existed without the consent of the owner of the land." In the case of *Daniel* v. *North*, 11 East, 374, Lord Ellenborough says, "the foundation of presuming a grant against a party is, that the exercise of the adverse right, on which such presumption is founded, was against the party capable of making the grant." And in the case of *Barker* v. *Richardson*, 2 B. & A. 579, it was decided, that a grant of an easement could not be presumed, when it appeared, that the presumed grantor was incapable of making it. In the case of *Cross* v. *Lewis*, 2 B. & C. 686, which was an action for obstructing the plaintiff's light and air, Bayley J. says, "I do not say, that twenty years possession confers a legal right, but uninterrupted possession for twenty years raises a presumption of a right; and ever since the decision of *Darwin* v. *Upton*, (2 Saund. 175) it has been held, that in the absence of any evidence to rebut that presumption, a jury should be directed to act upon it." In *Ricard* v. *Williams*, 7 Wheat. 109, when speaking of presumptions relating to grants, Mr. Justice Story says, "they are founded upon the consideration, that the facts are such as could not, according to the ordinary course of human affairs, occur, unless there was a transmutation of title to, or an admission of an adverse title in, the party in possession. They

may therefore be encountered and rebutted by contrary presumptions; and can never fairly arise, when all the circumstances are perfectly consistent with the non-existence of a grant. *A fortiori,* they cannot arise, where the claim is of such a nature, as is at variance with the supposition of a grant." The doctrines asserted may well be permitted to rest, so far as authority is concerned, upon these cases and names without further reference. In *Williams* v. *Nelson,* 23 Pick. 145, it is said, " if such flowing were not originally rightful on the mill owner's own land or by permission of the land owner, it seems not easily accounted for, that such owner should acquiesce for a long series of years, without any claim to damage. The inference therefore is, that his consent was given voluntarily, or purchased by some deed or other act, which is lost by lapse of time." However correct this reasoning may be when applied to cases, where the owner of land has suffered damage, and may assert his rights, it must be restricted to such cases, before it can be received and acted upon. For where the owner of the land has not suffered damage, and cannot therefore maintain any action at common law or process under the statute, there is no difficulty in accounting for his acquiescence for a long series of years. It would not only be perfectly consistent with the non-existence of a grant or other purchased right, but it would be contrary to the ordinary course of human affairs to expect any thing of the kind, while the law enabled him to accomplish all his purposes without it. It is not therefore necessarily true, " that the enjoyment of the right, free from all claim for damages, for forty years, was a right beyond that conferred by statute." The positions, that " the statute, strictly speaking, does not confer on the mill owner the right to flow the land of another, it conveys no interest in the nature of leasehold or easement, or otherwise, or any authority to make any actual use of the other's land as a pond or reservoir. The owner may still embank against the water, if he pleases, and thus preserve his own land from being flowed," if correct, can be of little value in the practical affairs of life. It is not impossible to conceive of such a state of things, that it would

not be possible to raise a suitable head of water, if the owner
of the lands might embank against its flow. And yet the stat-
ute authorizing one to raise a suitable head of water, gives the
right to use the means necessary for its accomplishment. And
the notion of employing one person legally to raise such a head
of water, although he may thereby injure others, and of legally
employing the others to prevent his doing it, is not very satis-
factory.

When it is said, that " he may by force of the statute raise
and maintain his dam without grant or license of the owner of
the land flowed by it, but he cannot maintain it free from all
claim for damage," the statement must be considered as ap-
plicable to those cases only, where the flow of the water occa-
sions damage. And cases of a different description, as the
books show, are not of very unfrequent occurrence in this
State. To presume one person to have obtained a grant or
other acquired right to flow the land of another from an enjoy-
ment of it for more than twenty years, while the law gave him
such right of enjoyment, and deprived the other of all remedy
and right of interruption, is irreconcilable with one's sense of
moral right, or with the principles of justice. And such a po-
sition, it is believed, cannot be maintained upon authority. If
the language used in the case of *Tinkham* v. *Arnold* may re-
quire to be limited and applied to the time, during which no
damages have been occasioned by the flow of the water; the
language used in the case of *Williams* v. *Nelson* must also be
limited and applied to cases where damages have been occa-
sioned by it, before it can be admitted to lead to a correct con-
clusion.

Another question is, whether the respondent, upon the facts
proved in this case, can be considered liable for the damages
caused by the flow of the water occasioned by the stone dam.
The owner or occupant of the mill, for the use of which the
water is raised, is by the statute made liable for the payment
of the damages. And the ninth and tenth sections of the act
would seem to require such a construction, as would make the
owner or occupant of the milldam, which raised the water for

the use of the mills, also liable. One, who is neither the owner or occupant of a watermill, for the use of which the water has been raised or continued, nor the owner or occupant of the milldam, is not made liable, although he may appear to be benefitted by the flow of the water. It appears, that the dam " was erected on the land of Francis M. Rollins by Joseph Southwick and others, mill owners, in 1817, as a reservoir dam to save the water for the use of several dams and mills on different parts of the stream." But it does not appear, that the mill partly owned by the respondent, Butterfield, was one of those several mills. There are certain facts stated, which might lead to such a conclusion. It was not however upon this ground, that his liability was presented to the consideration of the jury; but upon the ground, that he might be interested in the dam. The instructions on this point were, " that they would determine from said evidence, whether the respondents had not an interest in said stone dam; and if so they were liable to this process."

The phrase, interest in said stone dam, may not have been suited to communicate to the jury a clear perception of their duties; yet if the testimony would properly authorize them to find, that the respondents were either owners or occupants of the dam, there can be no just cause of complaint. They cannot be considered as owners of the dam; for the report states, that they neither " had any interest in the land, on which said stone dam was built, nor did they aid in building the same, nor had they since acquired any interest in it, unless it appears from the facts herein stated." There is nothing stated to authorize the conclusion, that Greenlow was a part owner of the dam. The only testimony tending to prove, that Butterfield was an owner or occupant of it is, that on one occasion he assisted another person to sluice logs through it; and on another occasion said, that one, who wished to have the water stopped to repair his mill, could not have it done, unless he should be at his proportion of the expense of resisting the lawsuit commenced by the town of China. The last remark implies, that he had some authority to control the flow· of the

water, and might, if alone considered, authorize the conclusion, that he was then an owner or occupant of the dam. But when considered in connexion with the other facts, that he was not an owner of the land or a builder of the dam, and that the builders in the year 1828 put in a new sluice and exercised an entire control of it, by permitting Greenlow to use the water for a certain purpose at their pleasure, and that such actual exercise of control over the dam and flow of the water, for aught that appears, has been continued, and that by virtue of it Greenlow still continues to use the water, it would seem to be too slight, and too nearly disproved, to authorize the conclusion, that he was an owner or occupant at the time, when this process was commenced. It is not necessary to determine, whether Greenlow's shop can be considered as comprehended by the term watermill, first, because his liability was not presented to the jury as arising out of his being the owner of such a mill; and secondly, because it clearly appears, that if it were to be regarded as a mill, it was not one of those mills, for whose use the head of water has been raised or continued. There is only a right to use the water for it at the will of the owners or occupants of the dam, and at such times and under such restrictions as they may please to prescribe. If it were a corn mill, the owner, as such, would not be liable in damages for flowing the water; for it would not be a mill, for whose use the water was either raised or continued. And it appears from the report, that whatever act Greenlow may have done upon the dam, or control he may have exercised over it, has been by the employment of others, who have erected it, and as against him at least have had the entire control and occupation of it. He can only receive such a portion of water, as the occupants of the dam are pleased to permit. Such a use of the water has a tendency rather to disprove than to prove, that he was an owner or occupant of it. Occupancy implies the present right of possession or control, and the testimony shews, that he could have no such right.

*The verdict is set aside and a new trial granted.*