NATHANIEL CLARK, *Complainant, versus* ROCKLAND WATER POWER COMPANY.

Chapter 381, of the Special Laws of 1860, provides that the defendants may convey, "by pipes sunk below the bottom of its outlet," Mill river, "the water of Tolman's pond, to the city of Rockland, and take and hold any land," &c., necessary for the purpose; but that nothing in the Act shall be construed to prevent the owners of mills, on Mill river, from using the water thereof in the same manner as they have heretofore done; and gives said mill owners a remedy by complaint to the S. J. Court, final judgment thereon to be the measure of yearly damages, until a new complaint is made.

In the trial of such complaint against said Company, for diverting the water by said pipes, and withholding it by the rebuilding and raising of an ancient mill-dam at the outlet of said pond, which the defendants had purchased since they were incorporated; it is not competent for the defendants to prove, by a witness, "that fourteen years ago, he owned a clothing mill and other machinery below the complainant's, between which and the witness' mill another stream united with Mill river; that the water of said river ran to waste at his dam, in the spring freshets, for the want of sufficient means to retain it at Tolman's pond for summer and fall use; that there was not enough left for milling purposes during summer and fall months; and therefore he could not run his mill much of the time during those seasons."

Nor is it competent for the defendants to prove that, in Mill river, below where said other stream unites with it, less water, that could be made useful to mills on the river, ran prior to the time when the defendants commenced their operations, than during the subsequent period, to the present time.

Clark *v.* Rockland Water Power Company.

It is not competent for a witness to give his opinion of the value of a mill, after having testified, that he had resided many years, and owned real estate in the vicinity of the mill; had been assessor of the town; that he was something of a judge of real estate in that vicinity; that he had no special knowledge of the value of mills on that stream; and that he had never bought, sold, owned or operated a mill.

The rights of the proprietors of the defendants' mill cannot be measured by the amount of grain they might have to grind within a given time, nor by the peculiar structure of their water wheels; but by the natural flow of the stream as modified by grant or prescription.

The defendants have no authority, under their Act of incorporation, to operate a gristmill as an independent business.

By said Act, the right to recover damages by complaint is given to the mill owners on the stream, only in case the corporation, in *the exercise of the powers therein granted*, shall damage the mill privileges on the river.

If the corporation damaged the mill owners in any other manner than in the exercise of the powers conferred in the Act, by unreasonably or unlawfully diverting or detaining the water of the river, the remedy of the mill owners would be by some other form of action.

The common law and statute rights of riparian proprietors stated.

A request for instructions not applicable to the case may be refused.

Damages in the trial of such complaint.

On Exceptions to the rulings of Rice, J., at *Nisi Prius.* Complaint.

The complaint set out the title to the complainant's mill, &c., and alleged that the defendants had, in the exercise of the powers granted to them by their Act of incorporation, done great damage to the complainant's said mill and privilege, by diverting the water therefrom, and by stopping the water of Tolman's pond and preventing it from running through the outlet thereof and by its accustomed and natural channel to the complainant's mill and privilege, &c.

The defendants pleaded "not guilty," with a brief statement denying that they had, in the exercise of the powers granted them by the Act of incorporation, damaged, in any manner, the complainant's mill privilege, &c.

Complainant proved title and possession to the mill mentioned in the complaint, prior to October, 1854; that it was situated on Mill river issuing from Tolman's pond, two and one-half miles below the outlet; that said mill was first built on or about 1830.

It appeared that, prior to the passage of said Act, Tolman's pond was and had been dammed at the outlet for a great number of years beyond the memory of the witness, and that it had been always used as a reservoir by the successive owners of a mill one-third of a mile below its outlet, modernly called the McLain mill, and that the successive owners of that mill had a flume gate in said dam, which was raised when that mill had need of water to operate it, and the gate closed to save the water when the mill stopped, thus controlling the water at the outlet for the benefit of the McLain mill. There was evidence tending to show that the pond had been flowed much higher, and the water detained much longer since the defendants had owned the McLain mill than formerly.

It appeared that the pipe for conveying the water to the city of Rockland, was inserted into the pond at a depth two feet on a level lower than the mudsill of said flume, and that the defendant company made a new flume, placing it fifteen inches lower than the mudsill of the old flume and excavated above and below so as to secure that much greater capacity for said reservoir pond.

It also appeared that, on Jan. 21, 1854, Lewis McLain, who owned the said McLain mill, conveyed said mill and privilege to the defendants, "together with a passage way, or path, forever, from said mill-dam to the foot of said Tolman's pond, with the right of entry and keeping up a dam at said Tolman's pond, for the purpose of saving the water for the use of the said grantees, and also the right to raise the water and flow the land at the head of said pond and around the same, and also all the rights, appurtenances and privileges appertaining to said mill, with the right of raising said mill pond and flowing the land as far as it shall be necessary, they paying therefor $5000 ; that a large sum was expended in its improvement and that it has since been run as a grist-mill, grinding a large quantity of corn annually, under the direction of W. A. Farnsworth."

Theodore P. Howard testified that he has been the miller

since January, 1855, that he has ground large quantities of grain annually, and always saved the water of Tolman's pond for the use of the mill by shutting the gate at the outlet whenever he did not need it for the mill, except that, in 1857, in July and August, when they had less grinding to do than usual, and the pond being nearly full, he let down water enough daily to grind 125 bushels of corn, for several days, when he had no use for it at that mill, and that he always drew water to grind whenever he had grinding to do, and that he acted under the directions of said Farnsworth; that he had and exercised full control over the gate at the flume at said outlet and opened it and shut it with sole reference to and for the benefit of said mill in grinding.

There was evidence tending to show that W. A. Farnsworth was the agent of the defendants, that the mill was operated under his direction, and that the profits thereof were paid into the treasury of the company, and that it was necessary for the successful operation of the defendants' water works that the head of water in the pond should be kept up as high as practicable for that purpose.

There was evidence tending to show that the quantity of water diverted from the pond annually, by the defendants, to supply the village with water, did not exceed 7½ inches in depth of the superficies of said pond, in a year, and that the said pipe, by which the water is conducted from the pond to the village, as laid, is incapable of conveying from said pond to the village over about ten inches in depth of the superficies of the pond in a year.

There was evidence tending to show that the said 7½ inches in depth, afforded 198,000 gallons daily during the year, being 1980 hogsheads of 100 gallons each per day. It appeared that there were 600 families supplied with the water, and that not over half of the quantity drawn was employed for family uses, the other half being allowed for the various other uses. That would give to each family 165 gallons per day, and, averaging five persons to a family, it would afford

33 gallons to each person daily, through the year, leaving the remaining 990 hogsheads for other uses daily.

It further appeared that, in 1854, after purchasing said mill, the defendants raised the dam at the outlet of the pond 15 inches, and thus, with the additional depth given to the outlet, increased the reservoir pond in depth and capacity two feet and nine inches; and there was evidence tending to show that, in the spring freshets, the said pond, with its improved capacity, could not hold all the water which accumulated therein, but much would nevertheless run to waste, and that the same at sometimes, if not usually, would be the case in the fall and other freshets.

The testimony also tended to show that the waste way has been filled up so that no water can pass except when defendants hoist their gate at the outlet, and that they have retained all fall flood in the pond, and most of the spring floods.

There was evidence tending to show that, since October, 1854, the McLain mill and the plantiff's mill have had a better supply of water, take the year through; and that it flowed down Mill river, on which these mills stand, more uniformly and more beneficially for the mill privileges than for many years before 1850, and plaintiff introduced evidence tending to show the contrary, and that for many years anterior to 1852 the plaintiff's mill, then owned by Jacob Ulmer, had an enduring supply of water through the year with slight deficiency in the pinch of the drought.

The defendants' counsel requested the following instructions to the jury : —

That, if the defendants opened and shut the gate at the outlet of Tolman's pond as they had use for the water in driving their mill, letting the water flow when they had work to do, and closing the gate when they had no use for it, and stopping their mill to save the water for further use when grists came in, and thus preventing the water from running to waste, and saving it for a dry time in prospect,

such alternate use and detention of the water would not render defendants liable in this process.

That defendants cannot be held accountable under this process for retaining or withholding the water of Tolman's pond for the purpose and uses of their mill, if it appear that they used the water in running said mill as much as the work they had to do in said mill required, and did let it flow from said pond and through their mill whenever they had grinding to do in said mill.

That the change of wheels in the defendants' said mill, by which less water is used in a given time in driving the same, than was used by the former mill, was no violation of the rights of the plaintiff, provided the water saved thereby was ultimately used to drive said mill and to flow on in its natural channel.

But the Judge declined so to instruct the jury.

The Court instructed the jury that the charter of the defendants did not authorize them to purchase and operate a gristmill, or an independent business disconnected with their works for supplying the city of Rockland with pure water, and in case they had so done, and the complainant had suffered damage thereby he could not recover for such damage in this process.

But, if the mill and privilege, with the right to flow Tolman's pond pertaining thereto, was necessary to the successful operation of the defendants' works for supplying the city of Rockland with pure water, and was used by the defendants as a means of carrying into effect the purposes and objects of their charter, they would be entitled to the right to flow · and control the water in the Tolman pond, in the same manner and to the same extent as such rights had been acquired, and were possessed by the grantors of the defendants at the time said mill and privilege and right to flow were conveyed to defendants, and would be liable in this process for damages occasioned to the complainant's privilege, so far, and only so far, as such damages were occa-

sioned by exceeding the rights thus connected with and pertaining to said mill and privilege.

Other appropriate instructions were given.

The Court ruled that under this process damages, if any occured, might be recovered up to the time of finding the verdict, and instructed the jury to assess the damages for each year, commencing with October, 1854, up to October, 1859, and to find the damages from that time up to the time of finding the verdict; and the jury found and rendered the following verdict in accordance with such instructions:—

The jury find the defendants are guilty in manner and form as the complainant has alleged, and assess yearly damages for the complainant as follows, to wit:—for the year ending on the 1st day of October, 1855, $88; for the year ending October 1st, 1856, $96,12; for the year ending October 1st, 1857, $117; for the year ending October 1st, 1858, $150; for the year ending October 1st, 1859, $150. And at the rate of $150 a year from the 1st day of October, 1859, to the day of finding this verdict, being $16,66. Amounting in all to the sum of six hundred and seventeen dollars and seventy-eight cents. Defendants excepted.

*Thacher & Ruggles*, for the defendants.

*Gould*, for the complainant.

The opinion of the Court was drawn by

RICE, J.—This complaint is based upon the provisions of c. 381 of the Special Laws of 1850, being an Act to incorporate the Rockland Water Power Company, for the purpose of conveying to the village of Rockland a supply of pure water for domestic purposes, &c.

The 2d section of the Act provides that the corporation may hold real and personal estate necessary and convenient for the purposes aforesaid, not exceeding in amount seventy-five thousand dollars.

In the 3d section it is provided that "nothing in this Act be taken or construed to prevent the owners of mills, or of

Clark *v.* Rockland Water Power Company.

mill privileges, on the stream flowing through the outlet of said pond, from using the water thereof in the same manner that they now do or have heretofore done."

Section six provides for the manner of obtaining redress on the part of mill owners in case they shall be injured by the operations of the corporation.

On the trial of the cause, the defendants offered to prove by Horatio Alden, that being possessed, fourteen years ago, and for many years prior to that time, of a clothing mill and other machinery on said Mill river stream, a mile below. the plaintiff's mill, that the water of that river ran to waste at his dam, in the spring freshets, for the want of sufficient means to retain it at Tolman's pond, for summer and fall use; that there was not enough left for milling purposes, during the summer and fall months; and, for want thereof, he could not run said mill much of the time during that season of the year; and that for that reason he removed his works to Camden.

The Court, being informed that there was another stream that united with the Mill river between the plaintiff's mill and said Alden's mill, rejected the evidence. Whether other considerations concurred in inducing the Court to exclude the offered evidence does not appear.

The only legitimate purpose perceived for which this testimony could be introduced, was to institute a comparison, by which to determine the flow of the water at the plaintiff's mill, on different years and at different periods of the year before and since the construction of the defendant's works. Did the proposed testimony afford any reliable elements from which such a comparison could be made? We think not. It does not appear what portion of the water that ran to waste during the spring freshets, flowed from the west, or from the east branch of the river; nor how. much water was required to run *Alden's* mill and *other machinery;* nor how the requirements of his mill would compare with the requirements of the mill, on the plaintiff's dam; nor whether the requirements of water, at his mill,

were greater or less in the spring or summer and fall; nor whether there is sufficient water now flowing in said stream in the spring or summer to run his mill. In fact there were no elements of comparison offered which could afford any safe or reliable data for the judgment of a jury. *Aldrich* v. *Pelham*, 1 Gray, 510.

The evidence offered presented several purely collateral issues, which were both remote and uncertain, affording no reliable ground for comparison if established, and were calculated rather to confuse and mislead the jury than to aid them in coming to a correct conclusion on the matter submitted for their determination. *Moulton* v. *Scruton*, 39 Maine, 287.

The defendants also offered to prove, by other witnesses, that in the Mill river stream below said western branch, less water, that could be made useful to mills on the stream, run prior to 1850, than during the subsequent period, to the present time. This testimony was not less objectionable in its character than that just considered, and for similar reasons. The situation, condition and requirements of the mills below the west branch do not, so far as appears, present such points of similarity to the plaintiff's mill and privilege, as to afford any reliable data for comparison. *Collins* v. *Dorchester*, 6 Conn., 396.

Defendants further offered to prove that the plaintiff's mill privilege had been increased in value by the improvements they had made at the outlet of Tolman's pond, and by the manner they had used the water thereof, and called Timothy Williams, who testified that, in 1850, he carefully examined the plaintiff's mill privilege and mill to ascertain the value thereof, and that he had resided many years in the vicinity of this mill privilege; that he was the owner of real estate in the vicinity; had been an assessor in said town; and was something of a judge of the value of real estate in that vicinity; but had no special knowledge of the value of mills and mill privileges on that stream; that he had never bought, sold, owned or operated a mill. The

defendants' counsel inquired of him the value of said mill in 1850. Being objected to on the ground that he was not an expert, the evidence was rejected by the Court.

Witnesses are ordinarily confined to the statement of facts within their own knowledge. There is, however, a class of persons, known in legal proceedings as *experts*, who are not only permitted to testify to facts within their own knowledge, but who may also give opinions based upon these facts, or facts otherwise proved, or upon hypothetical cases.

An expert is a skilful or experienced person; a person having skill or experience, or peculiar knowledge on certain subjects, or in certain professions; a scientific witness. *Heald* v. *Thing*, 45 Maine, 392.

The foundation on which expert testimony rests, is the supposed superior knowledge or experience of the expert in relation to the subject matter upon which he is permitted to give an opinion as evidence. This knowledge must be such as is peculiar to persons of skill and experience in some particular branch of business, or department of science, which is the subject of investigation, and not of such a character as to be open and common to all persons.

As a person, having such peculiar knowledge, the witness Williams was produced, and his opinion offered in evidence in the case. Was that opinion, tested by the rules applicable to the class of evidence, admissible? The point to be determined was the value of the plaintiff's mill and privilege in 1850, when it was examined by the witness. In relation to his knowledge upon this point, he says he " was something of a judge of the value of real estate in that vicinity, but had no special knowledge of the value of mills or mill privileges on that stream; that he never bought, sold, owned or operated a mill." He thus distinctly negatives the idea that he was possessed of peculiar knowledge or skill in relation to the matter upon which his opinion was desired. It cannot be necessary to cite authorities to show that the opinions of a witness, thus situated, are not admissible in

evidence as an expert, which is the only ground on which this witness was excluded.

In relation to the requested instructions, which were refused, and to those which were given, no error is perceived.

At common law, the riparian proprietors on a stream are entitled to the natural flow of the water of the stream, without diminution or obstruction, except so far as other parties thereon may have obtained paramount rights to control such flow by grant or prescription. If any such paramount rights have been acquired, they are to be exercised according to their terms and limitations.

Under our mill Act, riparian proprietors, who are owners of mill sites, may raise a head of water, by the construction of dams, on their own lands, across streams not navigable, for the purpose of working their mills, subject only to the prior and paramount rights of other proprietors. And the head of water thus raised, may be detained a reasonable time for the beneficial use of such mills. But the flow of the stream cannot be permanently obstructed, nor the water diverted by such dams, to the injury of the proprietors below, nor can the water be used capriciously to their injury. Each proprietor is entitled to the reasonable use of the water in its natural flow over his land.

The rights of the proprietors of defendants' mill cannot be measured by the amount of grain they might have to grind within a given time, nor by the peculiar structure of their water wheels, but by the natural flow of the stream as modified by grant or prescription. The defendants could not deal out the water of the stream in homeopathic or allopathic doses, to be determined simply by the number and size of the grists that might come to their mills, or to the character of their water wheels, irrespective of their own acquired rights or the rights of the proprietors below. By the rule contended for by the defendants, they would be enabled to withhold the entire flow of the water for an indefinite period of time, in case no grists came to their mill, or, permit the flow in minute quantities, if their business was

small and their water wheels required but little water to propel them; or, on the other hand, if they were pressed with business, and had wasteful wheels, they would be authorized to let the water down upon the lower proprietors in floods. Such is not the rule of law; and, therefore, the requested instructions could not have been properly given, irrespective of the chartered rights of the defendants.

But, further, the requests were inapplicable to the case.

The defendants had no authority, under their Act of incorporation, to operate a gristmill as an independent business. By that Act, the corporation was authorized to hold real and personal estate necessary and convenient for the purpose of conveying to the village of Rockland, a supply of pure water, for domestic purposes, &c.; and the right to recover damages by complaint is given to the mill owners on the stream only in case the corporation, in the *exercise of the powers herein granted*, shall damage the mill privileges on the stream. If the corporation damaged the mill owners in any other manner than in the exercise of the powers conferred in the Act, by unreasonably or unlawfully diverting or detaining the water of the stream, the remedy of the mill owners would be by some other form of action.

It was manifestly in view of this state of things that the instructions of the Court were given; and, under the circumstances of the case, as presented, they appear to have been full, distinct and apposite.

The only remaining question is, whether the verdict is sufficient in form and substance to determine the rights of the parties and form the basis of a judgment.

The Act of incorporation is very general in its provisions, and the precise manner in which the judgment for damages is to be entered up is not very distinctly indicated. It provides, in case the parties cannot agree, that the mill owner may cause his damages to be ascertained by complaint, in which all parties interested in any particular mill privilege, claiming to have been damaged, shall be joined, to the Supreme Judicial Court at any term held in the county of

Lincoln, and that said corporation shall be held to answer and plead thereto; and all questions of fact arising upon said pleadings shall be presented to and settled by a jury, unless the parties shall agree to a committee or referees; and that all questions of law shall be settled by the Court as in other civil suits.

The remedy is analogous to that provided under the mill Act for parties whose lands are flowed by the erection of mill-dams; and it is manifestly the intent of the Act under consideration, that damages arising under it shall be determined, as far as practicable, in accordance with the rules which prevail in cases arising under the mill Act.

Under the mill Act, the jury assess the damages to the time of rendering the verdict; but whether that verdict should find the damages in a gross sum or in yearly damages after the date of the complaint, the cases do not entirely concur  Com. v. Ellis, 11 Mass., 462; Bryant v. Glidden, 36 Maine, 36.  In Bryant v. Glidden, the Court remarks, that "the damages occasioned for three years before the complaint is filed, may be assessed in one aggregate sum.  The subsequent damages are to be 'yearly damages,' for the recovery of which, the owner of the land has a lien from the time of the institution of the original complaint, on the mill and dam.  Those damages cannot be found to be different in different years, and be incorporated with those occasioned before the complaint was filed as appears to have been done in this case."  The reason given for this rule is that to find the damages in solido, to the time of the verdict, would deprive the owner of the land of his lien, and other parties of rights secured to them by the statute.

Whether the true point of time from which "yearly damages" under the mill Act should be assessed is not that period when the commissioners, by their report, or the jury by their verdict, determine how far the flowing may be necessary, and what portion of the year such lands ought not to be flowed, has been matter on which different opinions have been entertained.  Inasmuch as the flowing under the mill

Act may be wholly different after it has been regulated by the commissioners from what it had been before, it is apparent that the "yearly damages" may also be different after that period, and therefore there is much force in the suggestion that this would indicate the point of time from which the "yearly damages," for the future, should be estimated and determined.

But whatever may be the difficulties in establishing a satisfactory rule for yearly damages under the peculiar provisions of the mill Act, no such difficulty exists in this case, as the law gives the complainant no lien, nor does it, in any manner, limit and modify the manner in which the defendants shall exercise their rights, as in cases of flowage. So far, therefore, as this case is concerned, no objection is perceived to entering judgment on the general verdict.

A question may, however, be raised as to the rule for future yearly damages. The Act provides that such judgment shall be the measure of yearly damages, until the parties issue a new complaint to the Court to be filed by either party, &c. The question will naturally arise *what final judgment?* It is obvious that the statute is very indefinite on this point. But fortunately the verdict of the jury has furnished the elements for the determination of the question under any conceivable construction. They have found the yearly damages before the date of the complaint, also after the date of the complaint, and until the verdict was rendered. Also the aggregate, for a series of years, to the time the verdict was rendered. From these data, if the parties should not agree, the future yearly damages may readily be established by the Court. But inasmuch as that question is not now distinctly before us, we do not deem it advisable to volunteer an opinion thereon at this time.

*Exceptions overruled, and*
*Judgment on the verdict.*

CUTTING, MAY, DAVIS, GOODENOW and KENT, JJ., concurred.