1998 ME 202

**Peter M. DOREY**

v.

**ESTATE of William C. SPICER, Jr. et al.**

Supreme Judicial Court of Maine.

Argued June 10, 1998.

Decided Aug. 5, 1998.

Stephen P. Beale, Skelton, Taintor & Abbott, P.A., Auburn, for plaintiff.

Stephen Hessert, Paul F. Driscoll, Norman, Hanson & DeTroy, Portland, for Robert Senger and others, defendants.

William L. Plouffe, Drummond, Woodsum & MacMahon, Portland, for Town of Bridgton, defendant.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, and SAUFLEY, JJ.

SAUFLEY, Justice.

[¶ 1] Peter M. Dorey appeals from the judgment of the Superior Court (Cumberland County, *Brennan, J.*) declaring that he does not have the right to control the flow of water through the dam at the outlet of Foster Pond in Bridgton, thereby raising and lowering the Pond's water level and affecting the property of the pondfront landowners, in order to generate a private supply of electricity. We affirm the judgment.

## I. Background

[¶ 2] Dorey owns property in Bridgton which lies downstream from Foster Pond [1] along Gristmill Brook. At the outlet of Foster Pond stands a dam which provided power for a sawmill from the mid–1800's to the mid–1900's. In 1991, Dorey filed a declaratory judgment action naming as defendants forty-four owners of waterfront property on Foster Pond, the Foster Pond Association, and the Department of Environmental Protection, seeking a declaration of his right to operate the dam at the outlet of Foster Pond, inclusive of a right to flood the Pond's waterfront land. He also sought an injunction precluding any of the defendants from interfering with those rights. Eight of the named defendants moved for summary judgment, asserting that Dorey did not hold any flowage rights relative to the outlet dam.

[¶ 3] The court (*Brennan, J.*) agreed with the defendants and granted them a partial summary judgment.[2] Following Dorey's motion for reconsideration and a subsequent trial management conference, the court held an evidentiary hearing to resolve the issue of Dorey's legal rights with respect to all of the defendants. The court then declared that Dorey did not have the right to flow the dam at the outlet of Foster Pond and thereby raise and lower the Pond's water level. This appeal followed.

## II. History of Conveyances

[¶ 4] Because Dorey bases his rights to operate the dam on his ownership of real property and purported purchase of flowage rights, a review of the conveyances giving rise to his claim is necessary to an understanding of the issues.[3] At the heart of this litigation lies real property located at, the outlet of Foster Pond and along the outflowing Gristmill Brook to the northeast. In 1774, Asael Foster acquired the land encompassing this property from the proprietors of the Bridgton Township. Soon thereafter, Foster built a gristmill and a dam (not the dam in dispute here) on what is now known as lot 9,[4] which lies downstream from the Foster Pond outlet along Gristmill Brook. In 1839, Asael's son Francis conveyed to Benjamin Knapp the right to use the land at the outlet of Foster Pond to construct a dam and use its water power to undertake sawmill operations. Knapp and Joseph Foster, Francis's son, built the dam and sawmill the same year.

[¶ 5] In 1849, Joseph Foster conveyed to Knapp a one-half interest in the sawmill property, "[r]eserving to the mills on the old privilege below, and the owner & occupants of the same, the right to draw water for the use of any mills which are, or may be on said old privilege when needed[.]" Knapp, however, relinquished that one-half interest back to Foster in 1860 in order to establish a third mill site downstream from the gristmill property.[5] The gristmill and sawmill properties then remained in the Foster family until 1916, when Edward Bennett inherited the properties upon the death of his mother, Almira Foster. By 1946, Bennett or his successors in title had conveyed to Everett

---

1. Foster Pond is also known and referred to as Foster's Pond and Ingalls Pond.

2. The court also granted a partial summary judgment to Dorey declaring that he has the right to use the gristmill property's dam to flow the sawmill property and the right to enter the sawmill property to repair, improve, and maintain the various waterworks on that property. In light of the court's other rulings, this portion of the judgment has not been challenged on appeal.

3. In the proceedings below, the parties agreed to address only the issues concerning record title to the properties at issue, reserving argument on equitable theories related to the historical uses of the properties in the event that Dorey was found, from the documents, to have the legal right to flow the dam. Because consideration of the historical use issues depends upon Dorey's posses-sion of flowage rights, his arguments sounding in equity are mooted by the trial court's ruling that he does not have such rights. *See Bureau of Employee Relations v. Maine Labor Relations Bd.*, 655 A.2d 326, 327 (Me.1995).

4. All lot numbers in this opinion are derived from Town of Bridgton tax maps.

5. No conveyances of the sawmill or gristmill properties since that time have contained any references to such a reservation. Although the 1859 and 1860 deeds between Knapp and Foster are not entirely clear concerning Knapp's relinquishment of his half-interest in the sawmill property, Dorey concedes that this relinquishment occurred.

and Frances Johnson four parcels of land along Gristmill Brook, spanning from the southwestern boundary of the original sawmill property, which encompassed the dam at the outlet of Foster Pond and the sawmill, to the northeastern boundary of the original gristmill property, which lay further downstream.[6]

[¶ 6] During the 1960's, the Johnsons conveyed the central portion of the gristmill property, lot 9, the northeastern portion of the gristmill property, lot 9–2, and a small portion of the sawmill property, lot 9–1, to William and Margaret Sewell. When the Sewells died, those lots became part of the Margaret B. Sewell Revocable Trust, and on January 18, 1980, the Trustee of that Trust conveyed lots 9, 9–1, and 9–2 to Dorey.

[¶ 7] Dorey then approached the Johnsons seeking to acquire the entirety of the original sawmill property for the purpose of generating electrical power for private use at his residence on lot 9. Although the Johnsons declined to sell the site of the outlet dam, identified as lot 27, or the site of the sawmill itself, identified as lot 11A,[7] they sold Dorey three property interests: (1) lot 9–3, a parcel adjacent to the northeastern border of the original gristmill property, (2) lot 9–4, a parcel lying in between lots 9 and 11A which straddles the original gristmill and sawmill properties, and (3) the "flowage rights" relative to the dam at the outlet of Foster Pond on lot 27.

[¶ 8] Lots 9–3 and 9–4 were conveyed to Dorey through a single deed, dated May 27, 1980. The flowage rights were addressed through a separate deed, dated May 28, 1980, by which the Johnsons purported to convey to Dorey "[t]he exclusive and perpetual right to use that certain dam erected at the outlet of Foster's Pond . . . and . . . all water power and rights as to the waters of said Foster's Pond and the outlet stream however acquired, now appurtenant, owned, used, and enjoyed in connection with the above described dam[.]" The May 28 deed further stated that "[t]he above described dam and

flowage rights and privileges shall be appurtenant to those premises which [Dorey] recently purchased from David C. Hamblett, Trustee of the Margaret B. Sewell Revocable Trust Agreement by deed dated January 18, 1980[.]"

### III. The Mill Act

[¶ 9] The private right to operate a dam and flood the property of upstream waterfront landowners, to the extent that it still exists, arises from the Mill Act, 38 M.R.S.A. §§ 651–59, 701–28 (1989), which has its genesis in the early statutory law of the Province of Massachusetts Bay. At common law, a dam that flooded the lands of upstream landowners was a private nuisance that rendered its owner vulnerable to an action in tort for damages arising from the dam's erection, an equitable order for abatement, and successive actions for yearly damages. *See Jones v. Skinner,* 61 Me. 25, 26 (1872). In 1714, however, the Province of Massachusetts Bay, in recognition and support of the "public good and benefit" provided by mills, enacted a law providing riparian landowners with the "free liberty" to establish mills on their property and limiting their liability to injured upstream landowners to the assessment and payment of yearly damages. *See Id.* at 27 (quoting Acts of 1714, ch. 111, Ancient Laws 404–5). In 1796, the Commonwealth of Massachusetts replaced the provincial law with "An Act for the support and regulation of mills[,]" the first section of which stated:

> [T]hat where any person hath already erected, or shall erect any water Mill on his own land, or on the land of any other person by his consent legally obtained, and to the working of such mill, it shall be found necessary to raise a suitable head of water, and in so doing any lands shall be flowed not belonging to the owner of such mill, it shall be lawful for the owner or occupant of such mill to continue the same head of water to his best advantage in the manner and on the terms herein after mentioned.

---

6. From at least 1943 until the present, the gristmill property has been used solely for residential purposes.

7. The sawmill converted from water power to electrical power at some point during the 1950's or 1960's, and ceased all operations in 1979.

Mass.Gen.Laws ch. 76, § 1 (1796). The remaining sections of that Act also limited the remedy available to the injured upstream landowner to the recovery of yearly damages. *See Jones,* 61 Me. at 27.

[¶ 10] Upon achieving statehood, Maine in 1821 enacted its own Mill Act, virtually identical to the 1796 Massachusetts law both in the language of its first section and in its limitation of remedies to the recovery of yearly damages. *See* P.L.1821, ch. 45, §§ 1–16. With the exception of an 1881 amendment that expanded the available remedies to include, at the election of the mill owner, the one-time recovery of damages in gross, *see* P.L.1881, ch. 88, §§ 1–3, Maine's Mill Act has survived to this day in essentially the same substantive form. *See* 38 M.R.S.A. §§ 651–659, 701–728 (1989). Specifically, section 651 of the current Act provides that "[a]ny man may on his own land erect and maintain a watermill and dams to raise water for working it, upon and across any stream not navigable; ... upon the terms and conditions and subject to the regulations hereinafter expressed." *Id.* § 651. Section 655 provides a cause of action for damages for "[a]ny person whose lands are damaged by being flowed by a milldam[.]" *Id.* § 655. And, finally, sections 711, 706, and 721, respectively, provide for the primary remedy of yearly damages, the alternative remedy of damages in gross, and a ban upon all other remedies otherwise available at common law. *See id.* §§ 711, 706, 721.

[¶ 11] The Mill Act is not only in derogation of common law riparian rights,[8] it also constitutes a state-sanctioned form of private eminent domain, whereby upstream landowners' rights relative to their waterfront property are taken, with compensation in the form of limited damages, for the "public good and benefit" provided by the otherwise private mill. As early as 1855, however, this Court questioned the necessity and constitutionality of the Act's "privatized" eminent domain, but nonetheless accepted the Mill Act as constitutionally valid because of "its great antiquity, and the long acquiescence of our citizens in its provisions." *Jordan v. Woodward,* 40 Me. 317, 323–24 (Me.1855).

This act ... arose out of the necessities of the people in the early days, when small water mills of various kinds were essential to the very existence of the settlers, but is now regarded somewhat as a legal anomaly, because at the present day, and under modern industrial conditions, its effect is the acquisition of property rights from one individual or corporation against their will for the benefit of another individual or corporation, by the mere payment of damages. *Were it a new proposition, its constitutionality might well be doubted.* But it has been so long acquiesced in as the policy of the State, and so constantly upheld by judicial decisions, that its validity is no longer debatable.

*Opinions of the Justices,* 118 Me. 503, 516–17, 106 A. 865, 873 (1919) (citations omitted) (emphasis added). Due to unique nature of the Mill Act, we construe its provisions strictly, declining "to extend [those] peculiar provisions by implication." *Jordan,* 40 Me. at 324.[9]

[¶ 12] Because the intent of the Mill Act was to permit industrial use and control of the water flow,[10] the flowage rights

---

8. *See* Kendall, *Water Law in Maine,* Me.B.Bull., July 1970, at 1.

9. In *Jordan,* a mill owner built a dam, flooded the land of an upstream landowner, and then sought to exclude the landowner from using the portion of the mill pond that lay over his flooded land. *See Jordan,* 40 Me. at 320–21. This Court questioned the continuing need for the private takings allowed by the Act and declined to construe its express grant of a right to flood the upstream landowner's land as implying any additional or implied rights. *See id.* at 324.

10. Although neither the parties nor the court addressed the issue in the proceedings below, it is not clear Dorey could invoke the provisions of

the Mill Act where his proposed use of the outlet dam is apparently private rather than commercial or industrial. *See* 38 M.R.S.A. § 651; *Central Maine Power v. Public Util. Comm'n,* 156 Me. 295, 327, 163 A.2d 762, 779 (1960) ("The riparian proprietor may use the [water] power for manufacturing and industrial purposes ... subject to the provisions of the Mill Act and to the payment of damages for all flowage caused."); *Clark v. Rockland Water Power,* 52 Me. 68, 78 (1860) ("Under our mill act, riparian proprietors, who are owners of mill sites, may raise a head of water, by the construction of dams, ... for the purpose of working their mills[.]"). Because we conclude for other reasons that Dorey

arising from the Act are directly tied to the ownership of the mill land, and are in the nature of an easement appurtenant, benefiting the mill site as dominant tenement and burdening the upstream landowners, collectively, as servient tenement.

> [T]he riparian proprietor ... can build dams upon his own land to develop power for milling and manufacturing purposes, subject to the provisions of the Mill Act and to the payment of damages for all flowage caused thereby; *but the flowage rights thus acquired become property rights in the nature of an easement appurtenant to the manufacturing plant.*

*Id.* at 507, 106 A. at 869 (citation omitted) (emphasis added). "[A]n easement that is appurtenant is incapable of existence separate and apart from the particular messuage or land to which it is annexed, there being nothing for it to rest upon." *Ring v. Walker,* 87 Me. 550, 558, 33 A. 174, 176 (1895); *see also Gilder v. Mitchell,* 668 A.2d 879, 881 (Me.1995) ("An appurtenant easement is created to benefit the dominant tenement and runs with the land."). Consistent with this description of flowage rights and with the language of the Mill Act, only the owner of the land upon which the dam is erected and maintained may be held liable for the damage caused by the flooding of upstream lands. *See Stevens v. King,* 76 Me. 197, 200 (1884); *Nelson v. Butterfield,* 21 Me. 220, 232 (1842).

## IV. Dorey's Claims

[¶ 13] The flowage rights at issue here came into existence pursuant to the Mill Act when Benjamin Knapp and Joseph Foster built the sawmill and dam at the outlet of Foster Pond in 1839. It is undisputed that the sawmill is no longer operational and that Dorey does not own the land on which the dam or sawmill sit. Notwithstanding the plain language of the Act limiting its benefits to any person erecting or maintaining a mill "on his own land[,]" however, Dorey claims present rights under the Act by virtue of three sources: (1) his May 28, 1980 purchase of flowage rights separate from any transfer of real property, (2) his May 27, 1980 purchase of a distant portion of the original sawmill property, and (3) his ownership in fee of the original gristmill property, which he alleges benefits from an 1849 reservation of flowage rights relative to the original sawmill property.

### A. Separate Conveyance of the Flowage Rights

[¶ 14] Dorey cites *Ring v. Walker* for the proposition that flowage rights are a unique type of easement appurtenant that can be transferred apart from the mill site to which they are appurtenant and made newly appurtenant to a downstream mill site. Contrary to Dorey's argument, however, *Ring v. Walker* did not directly address flowage rights or their transfer. *Ring,* rather, concerned two express reservations, made in the context of conveyances, of the rights to build, maintain, and use a log sluice through an upstream mill site for the benefit of certain downstream mill sites. *See Ring,* 87 Me. at 555–57, 33 A. at 175–76. This Court explicitly declined to treat the reservations as creating an easement appurtenant to any specific downstream mill site, instead finding them to be in the nature of "*a prendre in alieno solo,* as in *Engel v. Ayer,* 85 Maine 448 [27 A. 352]." *See id.* at 558, 33 A. at 176. "[A] profit *a prendre* in the lands of another, when not granted in favor of a dominant tenement, cannot properly be said to be an easement, but an estate or interest in land itself." *Engel v. Ayer,* 85 Me. 448, 455, 27 A. 352, 354 (1893) (citation omitted). Accordingly, the rarely addressed sluicing rights at issue in *Ring* are not analogous to the flowage rights at issue in this case. *Ring* therefore provides no support for Dorey's proposition that flowage rights pursuant to the Mill Act are a unique type of easement appurtenant that can be independently transferred apart from the mill site to which they are appurtenant.

[¶ 15] To the extent that flowage rights to the Foster Pond dam still exist, they are in the nature of an easement appurtenant to the dam site on lot 27 and the sawmill site on lot 11A and cannot exist apart from those lots. *See Opinions of the Justices,* 118 Me. at 507, 106 A. at 869. Accordingly, the con-

---

does not have a right to flow the dam, we do not reach this issue.

veyance of flowage rights alone in the May 28, 1980 deed is of no legal effect. The court therefore was correct in concluding that Dorey did not have flowage rights relative to the dam at the outlet of Foster Pond by virtue of that deed.

### B. Ownership of a Piece of the Original Sawmill Property

[¶ 16]  Dorey next claims flowage rights by virtue of his ownership of lot 9–4, which encompasses a piece of the original sawmill property to which the flowage rights were originally appurtenant. He has, however, offered no law to support his contention that Mill Act rights should be considered appurtenant to lot 9–4 merely because a portion of it was once part of a larger parcel that encompassed the sawmill property. Lot 9–4 is not the site of either the outlet dam or the sawmill, which together comprise the manufacturing plant to which the flowage rights are appurtenant. *See Opinions of the Justices,* 118 Me. at 507, 106 A. at 869. Because we construe the Act's provisions strictly, we conclude that only the owners of the lots actually containing the dam and the sawmill may be allowed to exercise flowage rights relative to the dam and thus be held liable for the resulting statutory damages. *See Stevens,* 76 Me. at 200; *Morton v. Franklin Co.,* 62 Me. 455, 456 (1873); *Nelson,* 21 Me. at 232. Dorey's reliance upon the May 27, 1980 deed is therefore misplaced.

### C. Ownership of the Gristmill Property

[¶ 17]  Finally, Dorey argues that he possesses flowage rights relative to the outlet dam through his fee ownership of the original gristmill property, located downstream from the dam and sawmill. Here he relies on the 1849 conveyance from Joseph Foster to Benjamin Knapp of a half-interest in the sawmill property, in which Foster reserved

"to the mills on the old privilege below [the gristmill property], the right to draw water for the use of any mills which are, or may be on said old privilege when needed."

[¶ 18]  Dorey asserts that this express reservation remains with the original gristmill property he currently owns. We need not reach Dorey's argument, however, because he overlooks the fact that, in 1860, Knapp relinquished his half-interest in the sawmill property back to Foster, thus extinguishing the need for and existence of Foster's earlier reservation. *See Great Cove Boat Club v. Bureau of Pub. Lands,* 672 A.2d 91, 94 (Me.1996) ("An easement appurtenant can be terminated ... by conduct of both parties (merger or estoppel)"); *LeMay v. Anderson,* 397 A.2d 984, 987 n. 3 (Me.1979) ("Unity of title to the dominant and servient estate, of course, extinguishes an easement."); *Fitanides v. Holman,* 310 A.2d 65, 67 (Me.1973) ("whatever claim to a right of way which might have existed ended with merger of the subject lots in one owner").[11]

[¶ 19]  In sum, Dorey does not own the property containing the dam or the sawmill, did not acquire rights to operate the dam by purchasing a distant piece of the original sawmill property, and could not acquire the appurtenant right to operate the dam without also acquiring the land upon which it sits.[12]

The entry is:

Judgment affirmed.

---

**11.**  Moreover, it is not clear that such a reservation would likely be of any use to one who seeks to control the water, not for working a mill, but for private generation of electricity.

**12.**  Because we conclude that Dorey does not hold the rights to flow the dam and flood the land surrounding Foster Pond, we do not reach the question of the continuing vitality or constitutionality of the Mill Act itself.