1999 ME 93

**George TRASK**

v.

**PUBLIC UTILITIES COMMISSION.**

Supreme Judicial Court of Maine.

Argued June 7, 1999.
Decided June 22, 1999.

Mark B. LeDuc (orally), Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Augusta, for appellant.

Gilbert W. Brewer (orally), Joanne Steneck, Public Utilities Commission, Augusta, for appellees.

Before WATHEN, C.J., and RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

WATHEN, C.J.

[¶ 1] George Trask appeals from a judgment of the Public Utilities Commission granting the City of Gardiner and the Towns of West Gardiner, Richmond, and Litchfield the right of first refusal to purchase the New Mills Dam property. Trask argues that the Commission erroneously interpreted Chapter 691 of its Rules and that the Commission erroneously applied 35–A M.R.S.A. § 6109 (Supp.1998)

instead of relying exclusively upon the Dam Abandonment Act (38 M.R.S.A. §§ 901–909 (Pamph.1998)). Finding no error, we affirm.

[¶ 2] The facts may be summarized as follows: The New Mills Dam (the "Dam") is located in Gardiner on the Cobbosseecontee Stream. The Dam was constructed in the 1840s to provide water to an adjacent mill. Pleasant Pond, part of the impoundment area of the Dam, which is abutted by the City of Gardiner and the Towns of West Gardiner, Richmond, and Litchfield, served as the primary water source of the Gardiner Water District (the "District") until the 1950s. At that time the construction of the Maine Turnpike degraded the water quality requiring the construction of two groundwater wells. The District has used the two wells as the exclusive source of water supply since 1980.

[¶ 3] In 1974 the District obtained the Dam from the City of Gardiner, which had operated the Dam for nearly a century. In 1982, the District constructed a hydroelectric facility on the Dam site to generate power. The Dam operated under a power purchase contract with Central Maine Power Company from 1983 to 1994. In 1994 the contract was bought out by CMP, the Dam's Federal Energy Regulatory Commission ("FERC") license was simultaneously surrendered, and the Dam was no longer used to generate power. Since the surrender of the FERC license, the Dam has been used to maintain the water level of Pleasant Pond. The District no longer generates income from the Dam, but continues to incur maintenance expenses.

[¶ 4] In September 1997 the District initiated steps to abandon the Dam pursuant to the Dam Abandonment Act, 38 M.R.S.A. §§ 901–909 (Pamph.1998). Pursuant to the provisions of that Act, the District filed a Notice of Intent to File with the Maine Department of Environmental Protection (the "DEP") and provided notices to various state agencies and

other interested parties. On October 2, 1997, the District filed a Petition for Release from Dam Ownership or Water–Level Maintenance. The filing of this Petition triggered the 180–day period provided under the Dam Abandonment Act. During that period, the District was required to consult with municipalities, abutting landowners, lake associations, and various state agencies to determine whether any of them wished to assume ownership. If a new owner had not been found during the 180–day period, the DEP would then have required the specified state agencies to assess the Dam's public value to determine whether one of them should assume ownership of the dam or whether the water should be released from the dam. The 180–day period was to expire on March 31, 1998.

[¶ 5] As the deadline approached, neither the property owners abutting the impoundment area, the state agencies, nor any of the four municipalities definitively offered to assume ownership of the Dam.[1] The Commission noted, however, that the municipalities were nearing completion of an interlocal agreement when, on March 27, 1998, the District received George Trask's offer to purchase the Dam. An emergency meeting of the Board of Trustees of the District was held on March 29, 1998, at which the Board discussed and accepted Trask's offer. Because the District had found a prospective owner, it withdrew its Petition for Release from Dam Ownership or Water–Level Maintenance.

[¶ 6] Mary–Ann MacMaster and others filed a complaint with the Commission pursuant to 35–A M.R.S.A. § 1302. The complaint requested the Commission to investigate the transfer of the dam to Trask for various reasons. Relying on 35–A M.R.S.A. § 6109, the Commission entered an order stating, *inter alia*, that the "District's acceptance of the offer of Mr. George Trask to purchase the New Mills

Dam is subject to the rights of first refusal held by the City of Gardiner, and the Towns of Litchfield, Richmond and West Gardiner ." Trask appeals.

[¶ 7] This case turns on the Commission's interpretation of Chapter 691 of its Rules and its interpretation of the interplay between the statute providing for a sale of land by a consumer-owned water utility (35–A M.R.S.A. § 6109) and the Dam Abandonment Act (38 M.R.S.A. §§ 901–909). Thus, we review the Commission's decision for errors of law. *See Town of Madison v. Public Utils. Comm'n,* 682 A.2d 231, 234 (Me.1996) (citations omitted). "The Commission's interpretation of a statute administered by it, while not conclusive or binding on this court, will be given great deference and should be upheld unless the statute plainly compels a contrary result." *Id.* (citation omitted). When we construe a statute, we give effect to the Legislature's intent. *See id.* (citation omitted). "Intent is ordinarily gleaned from the plain language of the statute itself. Such plain meaning will be applied so long as it does not lead to an absurd, illogical, or inconsistent result." *Id.* (citations omitted).

## I. Flowage Rights

[¶ 8] Trask first argues that the Commission committed an error of law in applying Chapter 691 of its Rules implementing 35–A M.R.S.A. § 6109 by measuring flowage rights in terms of acreage. Section 6109 was enacted for the following purpose:

[to] govern the sale or transfer by a consumer-owned water utility of land or property owned by that water utility for the purposes of providing a source of supply, storing water or protecting sources of supply or water storage, including reservoirs, lakes, ponds, rivers and streams, land surrounding or adjoin-

---

1. The Commission found that the District had reason to believe that the interest of the mu-

nicipalities in the Dam was only as a buyer of last resort.

ing reservoirs, lakes, ponds, rivers or streams, wetlands and watershed areas. 35–A M.R.S.A. § 6109 (Supp.1998). Section 6109 provides, *inter alia,* that "[t]he municipality in which the land is located shall have the right of first refusal to purchase any land that lies within that municipality's boundaries and is offered for sale under this section. That right is assignable by the municipality." 35–A M.R.S.A. § 6109(5) (Supp.1998). Section 6109 also expressly provides that the "commission may promulgate rules to implement this section . . . ." 35–A M.R.S.A. § 6109(4) (Supp.1998).

[¶ 9] Chapter 691 adopted by the Commission defines the property rights subject to section 6109 in the following terms:

> Water resource land. "Water resource land" means any *land or real property* owned by a water utility for the purposes of providing a source of supply, storing water or protecting sources of supply or water storage, including reservoirs, lakes, ponds, rivers or streams, wetlands and watershed areas, *and contains greater than five contiguous acres.* "Water resource land" does not include any land on which a utility has built a facility that is used exclusively for storing water as part of that utility's transmission and distribution system.

M.P.U.C. Reg. 65–407, ch. 691, § 1(E) (March 16, 1991) (emphasis added).

[¶ 10] In determining that the New Mills Dam qualified as "water resource land" within the meaning of the rule, the Commission interpreted the definition to include flowage rights. With respect to the five-acre threshold, the Commission measured the rights in terms of the acreage of land affected by the flowage. The Dam itself, the property on which it sits, and the areas included within two easements granted for access and egress to and from the Dam constitute only .71 acres. The Commission found, however, that the District proposed to transfer not only the Dam, but also any water or flowage rights that it may possess and that accompany operation of the Dam on Cobbosseecontee Stream. The Commission measured the flowage rights in terms of acreage, finding that the surface area of Pleasant Pond, part of the impoundment area of the Dam, measures 748 acres.[2]

[¶ 11] Trask argues that, because flowage rights are intangible and have no independent physical existence, they cannot be measured in acres. Accordingly, he argues that the Commission erred in determining that the five-acre threshold was met. We disagree.

[¶ 12] In a recent case we defined flowage rights as the "private right to operate a dam and flood [flow] the property of upstream waterfront landowners." *Dorey v. Estate of Spicer,* 1998 ME 202, ¶ 9, 715 A.2d 182, 184. Flowage rights "are in the nature of an easement appurtenant,[3] benefitting the mill site as dominant tenement and burdening the upstream landowners, collectively, as servient tenement." *Dorey v. Estate of Spicer,* 1998 ME 202, ¶ 12, 715 A.2d 182, 185–86. " '[A]n easement that is appurtenant is incapable of existence separate and apart from the particular messuage or land to which it is annexed.' " *Id.* (citations omitted).

[¶ 13] The Commission interpreted section 6109 and the implementing rule to include the acreage of flowage rights for the following reasons: The Legislature's intent is clear from the language of the

---

2. The Commission also stated in its order that: "Additional evidence is presented in Appendix A, which analyzes the extent of flooding due to the New Mills Dam under the most conservative assumptions. Even with such assumptions, the area still exceeds the 5–acre threshold."

3. "Easement appurtenant" is defined as "[a]n incorporeal right which is attached to a superior right and inheres in land to which it is attached and is in the nature of a covenant running with the land." BLACK'S LAW DICTIONARY 457 (5th ed.1979).

statute itself. Although not defined in section 6109, "land" is defined by statute in the general words and phrases section as follows: " 'Land' or 'lands' include lands and all tenements and hereditaments connected therewith, and all rights thereto and interests therein." 1 M.R.S.A. § 72(10) (1989). "Sale" is defined by commission rules to include "an assignment of a property right, a land lease of more than twenty years, a grant of an easement or any other encumbrance of the land, whereby the utility gives up for consideration rights to the use of a substantial part of the land surface." M.P.U.C. Reg. 65–407, ch. 691, § 1(B) (March 16, 1991). Because easements are included in the definitions of "sale" and "land" and because the rule provides a minimum threshold determined in acres, it is therefore necessary for the Commission to measure easements in terms of acreage. Otherwise, based on Trask's contention that an easement is immeasurable, no easement would fall within the protection of the statute. Such an interpretation would be illogical and inconsistent with the purpose of the statute.

[¶ 14] Moreover, the legislative history of section 6109 further supports the Commission's interpretation of the legislative intent. The section was enacted in 1990. The Statement of Fact states:

The purpose of this bill is to protect the public interest in valuable natural resource land and property that has been acquired by water utilities to serve public purposes. The bill requires water utilities to maintain the natural values of land acquired for public purposes and to ensure that such values are maintained if the land is deeded to new owners.

Statement of Fact, L.D.1982 (114th Legis.1990), as amended by Comm. Amend. A to L.D.1982, No. S–507 (114th Legis.1990).

[¶ 15] The Commission determined that inclusion of dams within the purview of the statute was consistent with the purpose of the statute. It noted, for example, the situation where a utility owns a dam and the shorefront property around a lake that is an impoundment area for the dam. The Commission concluded it would be inconsistent for the statute to ensure that the municipality possess the opportunity to preserve public rights in the shorefront property owned by the water utility, but not in the dam property. Without the dam, the public value of the upstream shorefront property would be diminished if the water were released.

[¶ 16] Finally, a review of other jurisdictions demonstrates that flowage rights have indeed been referred to in terms of acres. *See, e.g., Great Hill Lake, Inc. v. Caswell,* 126 Conn. 364, 11 A.2d 396, 396–97 (1940) ("plaintiff has succeeded to the ownership which its predecessors in title had in fee to seventeen acres of land, including that on which the dam is located, together with flowage rights over some seventy-five acres"); *City of Allegan v. Iosco Land Co.,* 254 Mich. 560, 236 N.W. 863, 863 (1931) ("project includes the building of a dam and flowage of over 1,500 acres of land"); *Skalicky v. Friendship Electric Light & Power Co.,* 193 Wis. 395, 214 N.W. 388, 388 (1927) ("prior to 1915 about 3 acres of their said tract had been flowed by reason of the maintenance of the 10–foot head, and that on such 3 acres 'a flowage right has long existed ....' "). Because the Commission's interpretation is reasonable and consistent with the language and purpose of the statute, we find no error.

## II. Interplay Between Statutes

[¶ 17] Trask next contends that the Commission erred in applying section 6109 instead of the Dam Abandonment Act exclusively. Trask argues that a conflict exists between the two statutes and that the conflict is particularly evident with respect to the right of first refusal that is required by section 6109 but not by the Dam Abandonment Act. He contends that, because of the conflict, the Commission should have applied the rule of statutory construction that the provisions of a more specific stat-

ute will be given precedence over a more general statute. *See South Portland Civil Service Comm'n v. City of South Portland,* 667 A.2d 599, 601 (Me.1995) (citation omitted).

[¶ 18] Contrary to Trask's contention, however, the Dam Abandonment Act is not necessarily more specific than section 6109. There are differences, but the two statutes need not be read as mutually exclusive and irreconcilable. Although conflicting in some respects, the provisions can be read in harmony, because they serve two distinct purposes. "We consider 'the whole statutory scheme of which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved.'" *South Portland Civil Service Comm'n v. City of South Portland,* 667 A.2d 599, 601 (Me.1995) (citation omitted). "We avoid a construction that leads to inconsistency between two statutes." *Id.* (citation omitted). Further, "[a]mong competing interpretations of a statute, we adopt the interpretation that avoids a result adverse to the public interest." *Id.* (citation omitted).

[¶ 19] The Dam Abandonment Act was enacted in 1996. The purpose of the Act was to "provide[ ] a formal process through which a dam owner may seek a new owner for the dam and provide[ ] for the issuance of a water release order to the current dam owner if a new owner can not be located for the dam." Statement of Fact, Comm. Amend. A to L.D. 646, No. S–484 (117th Legis.1996). The Act provides a process for a dam owner to abandon the dam if the owner cannot find a new owner to operate the dam, with the preference being to locate a new owner. The Act provides that the owner file a petition for release from dam ownership or water-level maintenance and, within 180 days of filing that petition, the owner must

consult certain persons and entities to determine whether they wish to assume ownership of the dam. *See* 38 M.R.S.A. §§ 901, 902 (Pamph.1998).[4] Those persons and entities are limited to the following:

A. Individuals and groups of persons, such as lake associations, who own property abutting the dam site, the water impounded by the dam or the waterway immediately downstream from the dam;

B. The Commissioner of Inland Fisheries and Wildlife, the Commissioner of Conservation and the Director of the Maine Emergency Management Agency;

C. The municipal officers of any municipality and the county commissioners of any unorganized area in which the dam or impoundment is located; and

D. Representatives of the tribal governments of Indian tribes or nations in whose territory a dam or impoundment is located.

38 M.R.S.A. § 902(3) (Pamph.1998).

[¶ 20] The Act then provides that if during that 180–day period, after consulting with these persons and entities and following the requisite procedures, the owner cannot locate a new owner to continue to operate the dam, the Department of Environmental Protection will notify the Department of Inland Fisheries and Wildlife, the Department of Conservation and the Maine Emergency Management Agency to assess the public value of the dam and those agencies will report back to the DEP stating whether the best interest of the public requires any of them to assume ownership of the dam. *See* 38 M.R.S.A. § 903 (Pamph.1998). If not, then the DEP will issue a notice and order to the dam owner to release the water from the dam. *See* 38 M.R.S.A. §§ 904, 905 (Pamph.1998). The Act does not contain any procedure if a person other than those required to be consulted pursuant to section 902 makes

---

4. The statute was amended in 1997 to allow a 180–day extension if the municipality applies and demonstrates a need in order to facilitate an agreement for municipal ownership or if the dam owner requests. P.L.1997, ch. 789, § 1 (effective April 16, 1998) (applicable to petitions pending on or after January 1, 1998) (codified as 38 M.R.S.A. § 902(1–A) (Pamph. 1998)).

an offer or if more than one party expresses an interest in assuming the property within the 180–day period. The Act also does not provide for the DEP to approve the new owner of the Dam. As in this case, if a new owner is located, the petition for abandonment may be withdrawn.

[¶ 21] Section 6109, on the other hand, deals with the situation in which a new owner is found and regulates the sale or transfer of water resource land by a consumer-owned water utility to any person or entity. It provides for a right of first refusal to a municipality in order to protect the public interest in the property. Thus, the Commission determined that a reasonable construction of the statutes would provide for the following procedure when a consumer-owned water utility files a petition to abandon a dam and a prospective owner is located: the dam owner follows the procedures set forth in the Dam Abandonment Act until such time as a prospective buyer is located and from that point forward section 6109 and the implementing rule applies. This construction gives effect to all statutory provisions and advances the purposes of both statutes. The Commission's interpretation is consistent with the purposes of the statutes, allows for both statutes to be read harmoniously, and avoids a result adverse to the public interest. We find no error.

The entry is:

Judgment affirmed.