MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2014 ME 11
Docket:       Pen-12-582
Argued:       June 12, 2013
Decided:      January 30, 2014

Panel:        SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.
Majority:     SAUFLEY, C.J., ALEXANDER, SILVER, GORMAN, and JABAR, JJ.
Concurrence:  SAUFLEY, C.J.
Dissent:      MEAD, J.

JOHN DOE et al.

v.

REGIONAL SCHOOL UNIT 26

SILVER, J.

[¶1]   John and Jane Doe, parents of Susan Doe,[1] and the Maine Human Rights Commission appeal from a summary judgment entered in the Superior Court (Penobscot County, *Anderson, J.*) in favor of Regional School Unit 26 on the Does' complaint pursuant to the Maine Human Rights Act (MHRA), 5 M.R.S. §§ 4592(1), 4602(4) (2013).   RSU 26 argues that the public accommodations section of the MHRA conflicts with a statutory provision regarding sanitary facilities in schools, 20-A M.R.S. § 6501 (2013).  We are called upon for the first time to interpret the MHRA, and particularly several amendments enacted by the Maine Legislature in 2005, as it applies to transgender students in schools.  We vacate the Superior Court's judgment.

---

[1]  The Superior Court granted the Does permission to file their complaint using pseudonyms.

# I. BACKGROUND

## A. Facts

[¶2] The following facts are supported by the summary judgment record, viewed in the light most favorable to the Does and the Commission as the nonprevailing parties. *See Trott v. H.D. Goodall Hosp.*, 2013 ME 33, ¶ 2, 66 A.3d 7.

[¶3] Susan Doe is a transgender girl. She was born male, but began to express a female gender identity as early as age two. Beginning in the first grade, she attended Asa Adams School in Orono. Susan generally wore gender-neutral clothing to school until her third-grade year, when her identity as a girl became manifest. At that time, the school principal first became aware that Susan was transgender.

[¶4] All third and fourth grade students at Asa Adams used single-stall bathrooms. Susan used the single-stall girls' bathroom with the support and encouragement of school staff. In third grade, teachers and students began referring to Susan as "she." By fourth grade, Susan was dressing and appearing exclusively as a girl.

[¶5] In early 2007, midway through Susan's fourth-grade year, school personnel implemented an educational plan, commonly referred to as a "504"

plan,[2] to address Susan's gender identity issues and her upcoming transition to the fifth grade, where students used communal bathrooms separated by sex.[3] The 504 process is generally designed to identify impediments to learning for individual students and to implement steps to help those students succeed in school.[4]

[¶6] By the time she was preparing to enter the fifth grade, Susan had received a diagnosis of gender dysphoria, which is the medical term for psychological distress resulting from having a gender identity different from the sex that one was assigned at birth. School officials recognized that it was important to Susan's psychological health that she live socially as a female. They did not interpret 20-A M.R.S. § 6501, or any other law, as prohibiting a person with Susan's diagnosis from using the girls' bathroom.

[¶7] A team consisting of Susan's mother, her teachers, the school guidance counselor, and the director of special services met in March 2007 to develop the 504 plan. The team agreed that school staff should refer to Susan, and encourage

---

[2] Such plans derive their name from section 504 of the Rehabilitation Act of 1973. P.L. 93-112, Title V, § 504 (September 26, 1973.) That section has since been amended, and can now be found at 29 U.S.C.A. § 794 (West, Westlaw through P.L. 113-65). It prohibits discrimination based on disability in any program or activity that receives federal funds, including local schools. 29 U.S.C.A. § 794(a), (b)(2)(B).

[3] The communal bathroom for girls had separate stalls for each individual user.

[4] The 504 process is typically used to help students who have disabilities, but who do not require a special education program. Although Susan did not have a disability, the format of the 504 plan was useful for addressing the impact of her gender identity issues on her educational experience.

4

students to refer to Susan, by her female name. The school counselor expressed to the group that, for a transgender girl like Susan, using the communal girls' bathroom was the best practice. The team agreed that requiring Susan to use the boys' bathroom was not an acceptable option; the principal later testified that it would not have been safe for Susan to do so. The minutes of the 504 meeting reflected the team's recommendation that Susan use the girls' bathroom. The minutes also reflected the team's awareness that a unisex staff bathroom was available for Susan to use in the event that her use of the girls' bathroom became "an issue."

[¶8] Susan began the fifth grade in September 2007. Her use of the girls' bathroom went smoothly, with no complaints from other students' parents, until a male student followed her into the restroom on two separate occasions, claiming that he, too, was entitled to use the girls' bathroom. The student was acting on instructions from his grandfather, who was his guardian and was strongly opposed to the school's decision to allow Susan to use the girls' bathroom. The controversy generated significant media coverage. As a result of the two incidents, the school, over the Does' objections, terminated Susan's use of the girls' bathroom, requiring her instead to use the single-stall, unisex staff bathroom. That year, Susan was the only student instructed to use the staff bathroom.

[¶9] The 504 team met again in December 2007 to discuss Susan's upcoming transition to middle school. Over the Does' objections, school officials determined that Susan would not be permitted to use the girls' bathroom at the middle school. Again, Susan was required to use a separate, single-stall bathroom. As a result, at the end of Susan's sixth-grade year at Orono Middle School, the Doe family moved to another part of the state.

B. Procedural History

[¶10] On April 10, 2008, while Susan was still in elementary school, Jane Doe filed a complaint with the Commission alleging that the superintendent and other school district entities[5] violated the MHRA by excluding Susan from the communal girls' bathroom at Asa Adams. The Commission unanimously found reasonable grounds to believe discrimination had occurred. *See* 5 M.R.S. § 4612(1)(B) (2013). The Does, as parents and next friends of Susan, and the Commission filed a complaint in the Superior Court on September 23, 2009, asserting claims for unlawful discrimination in education (Count I) and unlawful

---

[5] Both the Does' complaint with the Commission and the original complaint in Superior Court named four defendants. By stipulation, all defendants other than RSU 26 were dismissed with prejudice after RSU 26 assumed their liability.

6

discrimination in a place of public accommodation (Count II) on the basis of sexual orientation.[6]  *See* 5 M.R.S. § 4612(4)(A) (2013).

[¶11]  After the Superior Court denied the defendants' motion to dismiss all counts pursuant to M.R. Civ. P. 12(b)(6), the Does and the Commission filed an amended complaint on May 11, 2011, adding facts to Counts I and II based on Susan's exclusion from the girls' bathroom at Orono Middle School.  The Superior Court granted RSU 26's motion for summary judgment on all counts on November 20, 2012.  *See* M.R. Civ. P. 56(b).  The Does and the Commission appeal the Superior Court's entry of summary judgment on Counts I and II.[7]

## II.  DISCUSSION

[¶12]  This is the first case that has required us to interpret the Legislature's 2005 amendments to the MHRA that prohibit discrimination based on sexual orientation in public accommodations, educational opportunities, employment, housing, and other areas.  *See* P.L. 2005, ch. 10.  Particularly where young children are involved, it can be challenging for a school to strike the appropriate balance between maintaining order and ensuring that a transgender student's individual rights are respected and protected.  Many of the school officials involved in

---

[6]  The Does' complaint also included a claim for intentional infliction of emotional distress, but that count was dismissed with prejudice by stipulation.

[7]  Appellants do not challenge the entry of summary judgment on Counts IV and V, which alleged that RSU 26 failed to remedy a hostile education environment resulting from peer harassment during Susan's fifth- and sixth-grade years.

Susan's education exhibited tremendous sensitivity and insight over several years. The record reveals that her counselors and teachers strove to provide her with a supportive environment and were largely successful. As a result of its efforts, the school came under intense public scrutiny, which caused it to reconsider the propriety of the steps it had taken up to that point and ultimately to reverse course. We appreciate the difficulty of the situation in which the school found itself; nevertheless, we must assess schools' obligations pursuant to the Legislature's amendments to the MHRA without regard to the public's potential discomfort with the result. It is for the Legislature, not this Court, to write laws establishing public policy, and we must respect that constitutional division of authority, absent the Legislature adopting a law violative of the Maine Constitution or the United States Constitution. There is no issue of the Legislature exceeding its constitutional authority in this case.

[¶13] "We review a grant of summary judgment de novo." *Levesque v. Androscoggin Cnty.*, 2012 ME 114, ¶ 5, 56 A.3d 1227. Summary judgment is properly granted "if the record reflects that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law." *Id.* (quotation marks omitted.)

[¶14] This case requires us to examine the relationship between the public-accommodations provision of the MHRA and a provision of the Sanitary

8

Facilities subchapter of title 20-A, which regulates education. "[O]ur first task when interpreting a statute is to ascertain the real purpose of the legislation." *State v. Niles*, 585 A.2d 181, 182 (Me. 1990). Seemingly contradictory provisions should not be viewed as irreconcilable when they serve different purposes. *Trask v. Pub. Utils. Comm'n*, 1999 ME 93, ¶ 18, 731 A.2d 430. We give effect to the Legislature's intent, avoiding results that are inconsistent or illogical "if the language of the statute is fairly susceptible to such a construction." *Cote v. Georgia-Pacific Corp.*, 596 A.2d 1004, 1005 (Me. 1991). We must presume that the Legislature did not intend inconsistent results. *Woodcock v. Atlass,* 393 A.2d 167, 170 (Me. 1978).

[¶15] In construing a statute, we may properly consider its "practical operation and potential consequences." *Clark v. State Emps. Appeals Bd.*, 363 A.2d 735, 738 (Me. 1976). When one construction would lead to a result that is inimical to the public interest, and a different construction would avoid that result, the latter construction is to be favored unless the terms of the statute absolutely forbid it. *Id.* Moreover, "[w]e have the power and duty . . . to interpret statutes so as to avoid absurd results." *State v. Hopkins,* 526 A.2d 945, 950 (Me. 1987). "A court can even ignore the literal meaning of phrases if that meaning thwarts the clear legislative objective." *Niles,* 585 A.2d at 182. Such an approach "is not judicial legislation; it is seeking and enforcing the true sense of

the law notwithstanding its imperfection or generality of expression." *State v. Day*, 132 Me. 38, 41, 165 A. 163 (1933).

Section 4592(1) of the MHRA provides, in relevant part:

> It is unlawful public accommodations discrimination, in violation of this Act . . . [f]or any public accommodation or any person who is the . . . superintendent, agent, or employee of any place of public accommodation to directly or indirectly refuse, discriminate against or in any manner withhold from or deny the full and equal enjoyment to any person, on account of . . . sexual orientation . . . any of the accommodations . . . [or] facilities . . . of public accommodation . . . .

Section 4602(4) of the MHRA extends the same prohibition against discrimination based on sexual orientation to educational institutions and educational opportunities, subject only to an exception in section 4553(10)(G)(3) for religious institutions and programs that do not receive public funds.

[¶16]   The MHRA defines a "public accommodation" to include a public entity that "operates a place of public accommodation." 5 M.R.S. § 4553(8-B) (2013). An elementary school is a place of public accommodation. 5 M.R.S. § 4553(8)(J) (2013). The definition of "discriminate" "includes, without limitation, [to] segregate or separate." 5 M.R.S. § 4553(2) (2013). The definition of "sexual orientation" includes "a person's actual or perceived gender identity or expression." 5 M.R.S. § 4553(9-C) (2013). The MHRA provides no definition of "sex."

[¶17]  On the other hand, 20-A M.R.S. § 6501 requires that sanitary facilities be provided as follows:

> **1.  Toilets.**  A school administrative unit shall provide clean toilets in all school buildings, which shall be:
>
> . . . .
>
> > **B.**  Separated according to sex and accessible only by separate entrances and exits[.]

[¶18]  Section 6501 is located in the "Sanitary Facilities" subchapter of the "Health, Nutrition, and Safety" chapter of title 20-A.  It has not been amended since 1983.  Its purpose is to establish cleanliness and maintenance requirements for school bathrooms, as well as requirements for the physical layout of toilet facilities.  *See* 20-A M.R.S. § 2(1) (2013).  It does not purport to establish guidelines for the *use* of school bathrooms.  Nor does it address how schools should monitor which students use which bathroom, and it certainly offers no guidance concerning how gender identity relates to the use of sex-separated facilities.  In contrast, the sole purpose of the public-accommodations and educational-opportunities provisions of the MHRA is to ensure equal enjoyment of and access to educational opportunities and public accommodations and facilities.  The public-accommodations and educational-opportunities provisions were

amended in 2005 to prohibit discrimination against transgender students in schools.[8]

[¶19]  Because these statutes serve different purposes, they are not irreconcilable; one makes it a violation of the Maine Human Rights Act to discriminate in providing access to school bathrooms based on sexual orientation and the other requires schools to provide children with "clean toilets" separated according to sex.  Although school buildings must, pursuant to section 6501, contain separate bathrooms for each sex, section 6501 does not—and school officials cannot—dictate the use of the bathrooms in a way that discriminates against students in violation of the MHRA.[9]

[¶20]  RSU 26 argues that the sanitary-facilities provision preemptively created an exception to the MHRA's prohibition on sexual orientation discrimination twenty-two years in advance of the passage of the relevant sections of the MHRA.  However, we must presume that the Legislature did not intend the

---

[8]  Title 5 M.R.S. § 4592 was amended in 2005 to add "sexual orientation," which, pursuant to 5 M.R.S. § 4553(9-C) (2013), includes gender identity, as a protected class, P.L. 2005, ch. 10, §§ 3, 17 (effective March 31, 2005).

[9]  The Maine Human Rights Commission's 1984 interpretation of the Maine Human Rights Act provides that "[a]n educational institution may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 11 C.M.R. 94 348 ch. 4 § 4.13 (2000).  This regulation simply confirms that schools may provide separate bathrooms in compliance with 20-A M.R.S. § 6501 (2013) and emphasizes that neither sex may be given preferential treatment.  Like section 6501, however, it predates by more than twenty years the inclusion of sexual orientation in the MHRA.  It offers no guidance concerning use of sex-separated facilities by transgender students, and is therefore of minimal relevance to the present analysis.

MHRA to be construed as inconsistent with section 6501. *See Woodcock*, 393 A.2d at 170. In this case, a consistent reading of the two statutes avoids conflicting, illogical results and comports with the legislative intent by giving effect to both provisions. Therefore, we adopt a consistent reading of the two provisions.

[¶21] Because section 6501 does not mandate, or even suggest, the manner in which transgender students should be permitted to use sex-separated facilities, each school is left with the responsibility of creating its own policies concerning how these public accommodations are to be used. Those policies must comply with the MHRA. Here, RSU 26 agreed with Susan's family and counselors that, for this purpose (as for virtually all others), Susan is a girl. Based upon its determination that Susan is a girl, and in keeping with the information provided to the school by Susan's family, her therapists, and experts in the field of transgender children, the school determined that Susan should use the girls' bathroom. In so doing, the school provided her with the same access to public facilities that it provided other girls. In this regard, RSU 26 complied with both section 6501 and the MHRA.

[¶22] RSU 26's later decision to ban Susan from the girls' bathroom, based not on a determination that there had been some change in Susan's status but on others' complaints about the school's well-considered decision, constituted

discrimination based on Susan's sexual orientation. *See* 5 M.R.S. § 4592(1). She was treated differently from other students solely because of her status as a transgender girl. This type of discrimination is forbidden by the MHRA, *see id.,* and it is not excused by the school's compliance with section 6501. We vacate the Superior Court's entry of summary judgment and remand for entry of summary judgment in favor of the Does and the Commission.

[¶23] In vacating this judgment, we emphasize that in this case the school had a program carefully developed over several years and supported by an educational plan designed to sensitively address Susan's gender identity issues. The determination that discrimination is demonstrated in this case rests heavily on Susan's gender identity and gender dysphoria diagnosis, both of which were acknowledged and accepted by the school. The school, her parents, her counselors, and her friends all accepted that Susan is a girl.

[¶24] Thus, we do not suggest that any person could demand access to any school facility or program based solely on a self-declaration of gender identity or confusion without the plans developed in cooperation with the school and the accepted and respected diagnosis that are present in this case. Our opinion must not be read to require schools to permit students casual access to any bathroom of their choice. Decisions about how to address students' legitimate gender identity issues are not to be taken lightly. Where, as here, it has been clearly established

14

that a student's psychological well-being and educational success depend upon being permitted to use the communal bathroom consistent with her gender identity, denying access to the appropriate bathroom constitutes sexual orientation discrimination in violation of the MHRA.

The entry is:

> Judgment vacated. Remanded for further proceedings consistent with this opinion.

---

SAUFLEY, C.J., concurring.

[¶25] I concur in the decision of the Court and write separately to highlight two aspects of the majority and dissent that may be lost amid the Court's necessarily detailed legislative analysis. First, as noted, the school system at issue in this case was working in uncharted territory and undertook a rational and compassionate approach to the challenges presented to it. The school's efforts should not be lost or minimized simply because, in the end, its actions, initially agreed to by the parents of the student, contravened the Legislature's statutory pronouncements. Second, the points made by the dissent regarding the ramifications of the Court's decision today, which as the dissent notes "inescapably lead to the conclusion that an individual may not be denied access to

public bathrooms based upon sex," Dissenting Opinion ¶ 34 n.12, require legislative attention, and similarly should not be overlooked.

[¶26] With regard to the actions of the school, it bears repeating that the school system in this case accepted Susan as a girl, supported her parents' efforts to create a healthy school environment for Susan, and established a plan, memorialized in meeting minutes, by which all of the adults in Susan's life would work together in support of those goals. Critical to the issue before the Court today, the school actually anticipated the possibility that Susan could be required to use a single-user bathroom rather than the communal girls' bathroom, and the parents, at an earlier point in the planning, did not object to the school's anticipated action. Thus, although ultimately the parents, not unreasonably, sought to have their daughter treated identically to other girls at the school, and the law requires the school to do so, the school's actions in anticipating challenges and planning smooth transitions around those challenges were not unreasonable.

[¶27] Finally, I write to encourage, as has the dissent, legislative attention to the ramifications of the current language in the statutes that have been addressed by the Court today. Specifically, the Court has concluded, as it must based on the statutes, that discrimination in the public accommodation of communal bathrooms is prohibited based on sexual orientation. *See* 5 M.R.S. §§ 4553(10)(G), 4592(1),

4602(4) (2013).[10] The statute requiring that result, *id.* § 4592(1), also prohibits discrimination based simply on "sex." Thus, the next logical step given the Court's inevitable interpretation of the existing statute is, as the dissent points out, the assertion that access to the public accommodation of designated communal bathrooms cannot be denied based on a person's sex. *See* Dissenting Opinion ¶ 34 n.12.

[¶28] Put simply, it could now be argued that it would be illegal discrimination for a restaurant, for example, to prohibit a man from using the women's communal bathroom, and vice versa. I agree with the dissent that it is highly unlikely that the Legislature actually intended that result. Accordingly, on this matter of public policy, it would benefit the public for the Legislature to act quickly to address the concern raised by the dissent in this matter.

_____

MEAD, J., dissenting

[¶29] I agree with the broad principle confirmed in the Court's decision: the Maine Human Rights Act prohibits discrimination in access to public accommodations based upon sexual orientation. 5 M.R.S. § 4592(1) (2013).

_____

[10] Although 5 M.R.S. § 4553(10)(G) (2013) was amended after the events at issue here, *see* P.L. 2011, ch. 613, § 9 (effective Sept. 1, 2012) (codified at 5 M.R.S. § 4553(10)(G)(2) (2013)), the amendment is immaterial to the issues raised in this appeal, and I cite to the current statute.

"Public accommodations" include multiple-user public bathrooms. *See id.* (referencing the "accommodations" and "facilities" of places of public accommodation). "Sexual orientation" includes gender identity. 5 M.R.S. § 4553(9-C) (2013). Accordingly, a transgendered individual has the right to use a public bathroom that is designated for use by the gender with which he or she identifies. I depart and dissent, however, from the Court's final conclusion that RSU 26 has committed an act of illegal discrimination upon the facts of this case because well-established principles of statutory construction require a different result.

[¶30] A civilized society protects its citizens from discrimination that is based on petty prejudices and mean-spirited exclusionary practices. The MHRA identifies classes of persons who are entitled to specific protections from such discrimination. The Legislature has included sexual orientation as one of the categories entitled to protection, and rightfully so. Considering the issue presented here, transgendered persons who live their lives as a member of the sex with which they identify face unique challenges with regard to public multiple-user bathrooms. It is simply unreasonable to expect a transgendered person to enter a bathroom designated for use by the sex with which they do not identify. Doing so is likely to provoke confrontation, or even violence. If transgendered people are prohibited

18

from using bathrooms designated for the sex with which they identify, they are left with no practical recourse in most public settings. This result is simply untenable.

[¶31] The Court's decision concludes, and I agree, that elementary schools are places of public accommodation. Court's Opinion ¶ 16 (citing 5 M.R.S. § 4553(8)(J) (2013)). The MHRA provides that it is unlawful to withhold "facilities" in places of public accommodation, including bathrooms, from any person on account of "race or color, sex, sexual orientation, physical or mental disability, religion, ancestry or national origin."[11] 5 M.R.S. § 4592(1).

[¶32] The broad principle established by the Court's interpretation of the MHRA is that access to multiple-user public bathrooms may not be denied based upon sexual orientation. That principle, by implication, applies equally to the other categories enumerated in the MHRA. *See id.* Specifically, it means that no person may be denied access to a public bathroom in a school or other place of public accommodation on the basis of their race, color, physical or mental disability, religion, ancestry, national origin, or sex. Thus, the MHRA, as construed by the Court today, prevents the denial of access to any public bathroom on the basis of a person's sex. Obviously this result is an extraordinary departure from the well-established custom that public bathrooms are typically segregated by sex.

---

[11] By definition, "sexual orientation" includes gender identity. 5 M.R.S. § 4553(9-C) (2013). The term "sex" connotes the traditional concept of anatomical sex, or sex assigned at birth. The fact that both terms are included separately clearly denotes that neither is subsumed within the definition of the other.

[¶33]  The understandable response by those opposed to this inescapable result is: *the Legislature would never have intended that!*  I do not disagree.  But the plain language of the MHRA and the unavoidable implications of the Court's decision set a well-established societal custom (segregation of public bathrooms by sex) and the MHRA on a collision course.

[¶34]  I repeat that the right of transgendered individuals to access public accommodations consistent with their gender identity must be protected.  It falls to the Legislature to reconcile the plain language of the MHRA as it is currently written and interpreted by the Court with society's longstanding expectation of having multiple-user bathrooms segregated by sex.[12]

[¶35]  I realize that this issue at its broadest is not specifically presented by the facts of this case.  I address it to highlight the scope and potential ramifications of the Court's decision, to invite the Legislature to clarify its intent concerning this anomaly in the law, and to provide context for the statutory construction analysis required by this case that follows.

[¶36]  RSU 26 is not guilty of unlawful public accommodations discrimination if the Legislature has approved segregating school bathrooms by sex in a way that supersedes the MHRA.  Applying well-established rules of

---

[12]  I can find no authority, statutory or otherwise, that allows public bathrooms, other than school bathrooms (discussed *infra*), to be segregated by sex.  On the contrary, the plain language of the MHRA, read in conjunction with the principles announced by the Court today, inescapably lead to the conclusion that an individual may not be denied access to public bathrooms based upon sex.

statutory construction, I conclude that it did so by purposely leaving 20-A M.R.S. § 6501 (2013) in its current form after amending the MHRA in 2005. At the very least, this circumstance raises enough of a question to require us to defer to the Legislature to resolve the uncertainty created by section 6501's apparent tension with the MHRA. Section 6501 provides:

> **1. Toilets.** A school administrative unit shall provide clean toilets in all school buildings, which shall be:
>
> . . . .
>
> **B.** Separated according to sex and accessible only by separate entrances and exits[.]

[¶37]  Section 6501, in the specific case of school bathrooms, thus establishes, and indeed mandates, an exception to the MHRA's general rule forbidding the segregation of facilities in schools by sex. We recently reaffirmed "the fundamental rule of statutory construction that we favor the application of a specific statutory provision over the application of a more general provision when there is any inconsistency." *Cent. Me. Power Co. v. Devereux Marine, Inc.*, 2013 ME 37, ¶ 22, 68 A.3d 1262.

[¶38]  Furthermore, the Legislature is "presumed to be aware of the state of the law . . . when it passes an act." *Stockly v. Doil*, 2005 ME 47, ¶ 14, 870 A.2d 1208 (quotation marks omitted). Notwithstanding the Court's assertion that the purpose of section 6501 is merely "to establish . . . requirements for the

physical layout of toilet facilities," and not to "address how schools should monitor which students use which bathroom," Court's Opinion ¶ 18, I presume as I must that the Legislature was aware of the interplay between section 6501 and the public accommodations discrimination provision of the MHRA. It would make little sense for the Legislature to require that school bathroom facilities be "[s]eparated according to sex and accessible only by separate entrances and exits," 20-A M.R.S. § 6501(1)(B), and at the same time mandate that schools allow the use of those sex-segregated facilities by students of either sex.[13]

[¶39] The Court states: "[Section 6501] does not purport to establish guidelines for the *use* of school bathrooms." Court's Opinion ¶ 18 (emphasis in original). I vigorously disagree. The statutory directive to segregate bathrooms in schools by sex, and providing for separate entrances and exits for those bathrooms, clearly anticipates that the *use* of a bathroom would be restricted to the sex for which it has been designated. The statute is susceptible to no other reading. Thus I also disagree with the Court's announcement that Section 6501 somehow vests schools with the prerogative of "creating its own policies concerning how these public accommodations are to be used." Court's Opinion ¶ 21.

---

[13] Although not specifically defined in the MHRA, the only logical definition for the word "sex" in 5 M.R.S. § 4592(1) (2013) is the anatomical gender assigned at birth. Because the term has existed in section 6501 for decades, I conclude that the Legislature intended the same meaning there.

22

[¶40]   Accordingly, I depart from the Court's casual dismissal of the fact that the plain language of a specific statute explicitly requires segregating school bathrooms by sex.  The plain language of the provisions of section 6501 and the MHRA are in conflict, and I believe that principles of comity require us to defer to the representative branch of government to resolve the issue.

[¶41]  I would therefore affirm the judgment of the Superior Court.

_____

**On the briefs:**

John P. Gause, Esq., Maine Human Rights Commission, Augusta, for appellant Maine Human Rights Commission

Jodi L. Nofsinger, Esq. Berman & Simmons, P.A., Portland, and Jennifer Levi, Esq., and Bennett H. Klein, Esq., Gay & Lesbian Advocates & Defenders, Boston, Massachusetts, for appellants John and Jane Doe

Melissa A. Hewey, Esq., and David M. Kallin, Esq., Drummond Woodsum, Portland, for appellee Regional School Unit 26

Richard O'Meara, Esq., Murray, Plumb & Murray, Portland, for amici curiae Maine Chapter of the American Academy of Pediatrics; The Maine Psychological Association; The National Association of Social Workers-Maine Chapter; GLSEN Downeast Maine; GLSEN Southern Maine; Trans Youth Equality Foundation; The Maine Women's Lobby; Parents, Families and Friends of Lesbians and Gays (PFLAG); PFLAG Portland; PFLAG Machias; and Maine Transgender Network, Inc.

Zachary L. Heiden, Esq., American Civil Liberties Union of Maine Foundation, Portland, and Amanda C. Goad, Esq., American Civil Liberties Union Foundation, LGBT & AIDS Project, New York, New York for amici curiae American Civil Liberties Union of Maine Foundation and American Civil Liberties Union Foundation LGBT & AIDS Project

**At oral argument:**

Jennifer Levi, Esq. for appellants John and Jane Doe

John P. Gause, Esq., for appellant Maine Human Rights Commission

David M. Kalin, Esq., for appellee Regional School Unit 26

Penobscot County Superior Court docket number CV-2009-201
FOR CLERK REFERENCE ONLY